CAMDEN, AS NEXT FRIEND, APPELLEE, *v.* MILLER, APPELLANT.

(No. CA 2166—Decided October 15, 1986.)

*Stephen A. Schumaker,* prosecuting attorney, and *Susan H. Collins,* for appellee.

*Anthony B. Pennington,* for appellant.

BROGAN, P.J. On March 31, 1978, John Camden was born out of wedlock to Penny Camden. Camden initiated a

paternity action in 1979 against Richard Miller, claiming he was the natural father. The case was tried to a jury and a verdict was returned against Camden. The jury found Miller was not the father.

On September 12, 1984, a second paternity action was initiated pursuant to R.C. Chapter 3111 *et seq.* John Camden was named as plaintiff through his mother as next friend. On May 7, 1985, the court ordered the parties to submit to a Human Leukocyte Antigen blood test ("HLA"). The tests showed a probability of paternity of Richard Miller of 99.73 percent.

The case proceeded to a jury trial on November 22, 1985, at which Miller was found to be the father of John Camden.

Miller, appellant herein, filed a timely notice of appeal from the judgment below. He sets forth two assignments of error, which for clarity will be examined in reverse order.

"II. Appellee's expert witness testimony regarding testing results is pure hearsay and the court prejudicially erred in admitting such testimony."

Appellant contends the testimony regarding the blood and HLA tests was pure hearsay due to the expert's reliance on test reports which he had not personally prepared. Appellant argues the test reports and testimony concerning the reports were inadmissible even under the business records exception of Evid. R. 803(6).

Evid. R. 802 permits the admission of evidence, otherwise inadmissible as hearsay, when authorized by statute. Effective in mid-1982, the legislature enacted R.C. 3111.10, which permitted the admission of certain test results indicating the probability of paternity. R.C. 3111.10 provides in part:

"In an action brought under this chapter, evidence relating to paternity may include:

"* * *

"(C) Genetic test results, weighted in accordance with evidence, if available, of the statistical probability of the alleged father's paternity[.]"

R.C. Chapter 3111 does not set forth any foundational requirements for admission, except that the person doing the genetic testing is a qualified court-appointed examiner. However, it is unlikely that the legislature intended that no other foundational requirements be applied.

Research has revealed no Ohio cases which set forth the foundational requirements for admission of the HLA test. The only cases discussing the HLA test provide little guidance. In *Owens* v. *Bell* (1983), 6 Ohio St. 3d 46, 6 OBR 65, 451 N.E. 2d 241, the Supreme Court stated that HLA tests are basically genetic comparison exams rather than blood grouping tests. The court noted the recent medical and legal acceptance of HLA tests as proof of probability of paternity.

In *Heckard* v. *Jackson* (Jan. 31, 1985), Hamilton App. No. C-840110, unreported, the defendant objected to the testimony of plaintiff's expert in HLA testing and to plaintiff's exhibits regarding figures and frequency tables used by the expert to arrive at a paternity index and the defendant's probability of paternity, contending the data was hearsay.

The court stated that R.C. 3111.10 alleviated the necessity of satisfying the foundational requirements of Evid. R. 803(8) or 803(9). The court also found that the statute was of sufficient breadth to encompass the testimony and exhibits admitted. *Id.* at 4.

Although there are no decisions addressing what foundation must be met for admission of the HLA test results, cases involving the admission of blood-alcohol tests provide analogous evidentiary problems. Some of the foundational requirements for the admission of blood tests for alcohol

include: (1) the blood was timely taken, (2) from a particular identified person, (3) by an authorized person and in accordance with approved methods, (4) was properly labeled and (5) there was an unbroken chain of custody. See R.C. 4511.19; *State* v. *Schell* (1984), 13 Ohio App. 3d 313, 13 OBR 391, 469 N.E. 2d 999; *Cincinnati* v. *Sand* (1975), 43 Ohio St. 2d 79, 72 O.O. 2d 44, 330 N.E. 2d 908.

In *Willerick* v. *Hanshalli* (1984), 136 Mich. App. 484, 356 N.W. 2d 36, the court addressed the minimal foundational requirements for admission of the HLA test. Michigan had adopted a similar statute which permitted the admission of test results indicating the probability of paternity. The court stated at 488-489, 356 N.W. 2d at 38-39:

"[W]e believe certain minimal foundation requirements are necessary to insure reliability of the test results and relevancy under MRE 401. To this end, we hold that plaintiff was required to show that the blood tested was in fact that of the defendant, the plaintiff, and the child, and that the test results were based on reliable blood samples. See *People* v. *Cords, supra* [(1977), 75 Mich. App. 415, 254 N.W. 2d 911], p. 428. This includes establishing a chain of identification from the time the blood samples are taken to the time the samples are analyzed:

" ' "Where it 'appears that the various steps in the keeping and transportation' of the specimen, part, or object from the time it was taken from the body until the time of analysis 'were not traced or shown by the evidence' the identification of the thing analyzed is insufficient and the presumptions that official duty is properly performed and that public records are correct will not supply missing links in the chain." ' *Bauer* v. *Veith,* 374 Mich. 1, 3, 130 N.W. 2d 897 (1964) (quoting

from 21 A.L.R. 2d 1216, § 4, p. 1220)."

In the present action, the transcript demonstrates the following foundational steps concerning the HLA test results:

1. Judy Ward — person in charge of typing client authorizations for blood drawing, Clark County Department of Human Services. She testified that she gained consent from Penny Camden, Richard Miller and John Camden for drawing of blood. She obtained identification to ensure they were indeed the parties involved, took their pictures which were attached to the form, read them the authorization, and witnessed their signatures. The form was made at the time the parties were in the office.

2. Nora Brumfield — phlebotomist at Mercy Medical Center. She actually drew the blood from Penny Camden, Richard Miller and John Camden, took samples on June 5, 1985, and identified the parties from their pictures on client identification-authorization forms. She drew blood, one person at a time, labeled the sample with the client's name, date, time drawn, and drawer's initials. She then signed the statement and placed the samples in a styrofoam case. The container was sealed with special marking tape to ensure against tampering. The case was put in a box and given to June Petrie.

3. June Petrie — investigator with welfare department who coordinates the blood testing procedures. She was present when blood was drawn from the parties. After blood was drawn she took the sealed box to front office for the courier to pick up. She called Roche Biomedical on the day blood was drawn so the courier could be sent.

4. John Leinen — Associate Director of Paternity Evaluation with Roche Laboratories. He supervised the blood testing and the written protocols

by which the testing was performed. All technicians in the department are under his direct supervision. Records are made of each test by a person with knowledge of the events at the time they were recorded and in the normal course of business.

The courier dropped the samples into a forensic black box. Only two supervisors had the key. The samples in question were received on June 6, 1985 at 9:30 a.m. There were no signs of tampering. The samples are immediately tested to see whether the blood is "good" for further testing. Blood goes through two tiers of testing: (1) red cell antigen and (2) HLA. These tests were performed on blood from Penny Camden, John Camden and Richard Miller. Leinen calculated a probability of paternity from the data and found a 99.73 percent chance that Richard Miller was the father. Leinen also testified as to the identification devices he used to safeguard the accuracy of the test results.

A review of the above portions of the record reveals that the minimal foundational requirements were established to ensure the reliability of the test results and relevancy under Evid. R. 401. Appellee established that the blood tested was in fact that of the appellant, appellee and the child; the test results were based on reliable blood samples; and an unbroken chain of custody was established from the time the samples were taken to the time they were analyzed.

Although Leinen testified that the mechanical steps of the HLA testing were delegated to technicians, he was the immediate supervisor, which suggests the jury could have inferred he closely monitored their work. Leinen testified that all the appropriate steps were taken in the handling and testing of the blood specimens.

The trial court has broad discretion in the matter of admission or exclusion of expert testimony. The appellant's objections to the admission of Leinen's testimony regarding the test results were fully articulated and discussed at trial. An independent review of the evidence suggests the court's admission of the test results and testimony was a responsible exercise of discretion.

Appellant's second assignment of error is overruled.

"1. The court erred in admitting the testimony elicited from appellee's expert into evidence because (A) there was no opinion rendered consistent with the 'reasonable probability' standard; (B) the 'hypothetical question' posed to the expert failed to conform with the requirements of Evidence Rule 705, and (C) the opinion expressed by the expert usurped the function of the judge and jury."

Appellant raises several evidentiary issues involving the expert testimony of John Leinen. The claimed errors arise from the same passage of testimony at trial which begins as follows:

"Q. What is the probability of paternity that you arrived at in this case?

"BY MR. PENNINGTON:

"Objection. These's still been no demonstration of how he's calculated this, blood group by blood group, to reach that calculation.

"BY THE COURT:

"I'll allow the answer at this time. If you would like to cross-examine, you may do so.

"A. We determined that the probability of paternity in this case is 99.73 percent.

"BY MS. COLLINS:

"Q. What does that mean?

"A. It means that, with the assumption of the prior probability being equal to .5, there is a 99.73 percent chance that this man is in fact the true father of the child, John Camden.

There is less than a .3 percent chance, or much less than a 1 percent chance that he is not the true father of the child.

"Q. In addition to the statistical probability, is there also a combined paternity index calculation?

"A. Yes. That's the odds ratio that I was talking about where we compare the alleged father's ability to pass the genetic factors to the probability that a random man could pass the factors. The odds ratio that we calculated or the combined paternity index in this case is 376 to 1. Which interpreted means, that the alleged father in this case is 376 times more likely to have fathered this particular child than a single random unrelated man of similar racial background.

"Q. Making the assumption that the prior probability is .5, and in looking at your interpretation of the scientific data in regard to the testing that you have indicated, do you have an opinion to a reasonable degree of scientific certainty as to whether or not Richard Miller is the father of John Camden?

"BY MR. PENNINGTON:

"Objection. He can't make that kind of an opinion. He could give the calculation, but he don't [sic] have that kind of expertise.

"BY THE COURT:

"Ms. Collins.

"BY MS. COLLINS:

"Well, Your Honor, he is an expert and he is entitled to give his opinion under the Rules of Evidence based on the testing that he has done and the hypothetical assumption.

"BY MR. PENNINGTON:

"I believe that's prejudicial, Your Honor. She's asking him to say whether he's the father or not. He can present the evidence as to how he relates the calculations and how he presented it, assuming that all of the calculations can stand up. But I don't think the man has any capability at all

giving an opinion whether or not he's the father.

"BY MS. COLLINS:

"That's the whole point of expert testimony is to give an opinion and the calculations can be inquired by counsel on cross-examination, if he wishes.

"BY THE COURT:

"Well, I think maybe what Mr. Pennington's complaining to is perhaps if it is stated hypothetically, rather than conclusively as to this particular person.

"Q. If you had this odds ratio and statistical probability in a case, would it be your opinion that the male in such a case would be the father of the child?

"A. It would be my opinion based on my scientific understanding of the way things work in this system that it would be practically proven that the man is, in fact, the father of the child.

"BY MR. PENNINGTON:

"We would object, Your Honor, and move to strike that. We don't think that's a proper manner of answering.

"BY THE COURT:

"I'll allow that. Ms. Collins, you can continue your questioning."

Appellant's first complaint involves the following hypothetical question posed to Leinen:

"If you had this odds ratio and statistical probability in a case, would it be your opinion that the male in such a case would be the father of the child?"

Appellant states the question failed to require that the opinion be based on a "reasonable" probability and that the hypothetical question failed to list the vital facts.

Although the hypothetical question was inartfully stated, as it left out the "magic words," the appellant did not object to the question, but simply to the answer given by Leinen. Failure to make a timely objection resulted in a waiver. Furthermore, the hypothetical question need not include any par-

ticular number of facts to be valid. The facts upon which the hypothetical question is premised must simply be established by the party calling the witness by a preponderance of the evidence, and it is up to the jury to determine whether the preponderance test has been met. *Haas* v. *Kundtz* (1916), 94 Ohio St. 238, 13 N.E. 826; *Fox* v. *Indus. Comm.* (1955), 162 Ohio St. 569, 55 O.O. 472, 123 N.E. 2d 1.

Prior to elicitation of Leinen's opinion, he explained the development of the HLA tests, the general principles of genetics, exclusions of a possible father and the inability to exclude appellant in this case, the interplay of the genetic and non-genetic factors, and the calculations necessary for determining the probability of paternity. Thus, appellee had properly established the facts and data upon which the hypothetical question was premised.

Appellant also contends that the answer given in response to the above question was totally inappropriate as it was predicated upon inferences, conclusions or opinions of others. Leinen states:

"A.  It would be my opinion based on my scientific understanding of the way things work in this system that it would be practically proven that the man is, in fact, the father of the child."

The extent to which expert testimony and opinion evidence are received rests largely in the discretion of the trial judge. Under Evid. R. 703, the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.

Prior to the hypothetical question, Leinen went into an elaborate discussion concerning the test procedures, the data computations and the calculations used to determine the probability of paternity. His opinion was based on his own examination of the data and testing procedures, and his knowledge of the law of genetics. Leinen did not base his opinion on the expert opinions of another, but from his interpretation of the scientific data.

Ohio courts favor the admission of the opinion-answer. Consideration of the sufficiency of the factual content of the hypothetical question is a factor in determining the weight to be given the opinion-answer. *Mayhorn* v. *Pavey* (1982), 8 Ohio App. 3d 189, 8 OBR 258, 456 N.E. 2d 1222.

Appellant's final argument concerns Leinen's statement that it was practically proven that appellant was the child's father. He claims the statement operated to usurp the function of the jury. However in *McKay Machine Co.* v. *Rodman* (1967), 11 Ohio St. 2d 77, 40 O.O. 2d 87, 228 N.E. 2d 304, paragraph one of the syllabus, the Supreme Court held:

"In all proceedings involving matters of a scientific, mechanical, professional or other like nature, requiring special study, experience or observation not within the common knowledge of laymen, expert opinion testimony is admissible to aid the court or the jury in arriving at a correct determination of the litigated issue." See, also, Staff Notes to Evid. R. 704.

In the present action, the determination of the ultimate facts required the application of expert knowledge in the field of genetics. Such information is not within the common knowledge of the jury. Leinen was properly qualified to speak as to the subject matter involved, and the admission of his opinion did not constitute an invasion of the functions of the jury.

Appellant's first assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

WILSON and WOLFF, JJ., concur.