The STATE of Ohio, Appellee,

v.

UNDERWOOD, Appellant.

[Cite as *State v. Underwood* (1991), 73 Ohio App.3d 834.]

Court of Appeals of Ohio,
Washington County.

No. 90 CA 17.

Decided July 9, 1991.

*Michael G. Spahr,* Prosecuting Attorney, for appellee.

*Lambe & Burton* and *Nancy E. Brum,* for appellant.

---

PETER B. ABELE, Judge.

This is an appeal from a judgment of conviction and sentence entered by the Washington County Common Pleas Court after a jury trial. The jury found Jessie C. Underwood, defendant below and appellant herein, guilty of aggravated assault in violation of R.C. 2903.12, a felony of the fourth degree.

Appellant assigns the following errors:

First Assignment of Error:

"Defendant appellant was denied a fair trial by the prejudicial statements of the assistant prosecuting attorney in closing arguments. The trial court abused its discretion by failing to intervene because of the improper remarks by the Assistant Prosecuting Attorney."

Second Assignment of Error:

"The trial court erred to the prejudice of the defendant in allowing Dr. King to testify as to the insanity of the defendant over the objection of defense counsel in violation of Evidence Rule 703."

Appellant patronized Jud's Bar in Marietta, Ohio, during the evening of September 11, 1989. Myrtle Vandegrift, a fifty-two-year-old barmaid at Jud's Bar, testified at trial that since appellant had earlier informed her he had no more money, she refused his request to call a taxicab.

Appellant, intoxicated and angered by Vandegrift's refusal to comply with his request, went behind the bar, knocked Vandegrift to the floor, and pounced on her. Appellant held Vandegrift's neck with one hand and a knife with the other hand.

Robert Binegar, another patron in the bar, observed appellant's actions and decided to rescue Vandegrift. Binegar successfully knocked appellant off Vandegrift, but suffered three or four knife wounds in the process. An emergency room physician testified the wounds required approximately thirty-seven stitches.

Two witnesses testified they saw appellant run from the tavern. A Marietta police officer dispatched to the scene at 10:45 p.m. found appellant staggering in an alley near Jud's Bar. The officer observed blood on appellant's clothing and face. When the officer asked appellant his name, appellant answered, "Joe Blow from Idaho."

At trial, appellant admitted he was intoxicated on the night in question, but claims he accidentally fell into the barmaid when he caught his little finger in her blouse. Appellant claimed he didn't remove his knife from his pocket until after Binegar started choking him.

Appellant presented an expert witness who testified appellant was insane at the time of the crime. Dr. James P. Reardon testified appellant was involved in a highly emotional transference reaction to the barmaid, and mistakenly believed the barmaid was his mother-in-law. Dr. Reardon further testified that appellant attacked Binegar because appellant thought his life was in danger.

Appellant's second expert witness, a physician certified in addiction medicine, testified that there is a likelihood that appellant is an alcoholic. The physician further testified appellant's intoxicated state on the evening in question likely impaired his ability to act knowingly.

The state presented Dr. Stephen King on rebuttal. Dr. King testified that appellant was not insane at the time of the crime. Dr. King further testified he reviewed various written documents during the course of his examination of appellant. The documents included some "background information" pre-

pared by a Mr. Ryan. When asked about Mr. Ryan's qualifications, Dr. King testified:

"A. Mr. Ryan is a master level social worker. He has * * * over * * * ten years experience in this field. He is qualified as a social worker to collect the * * * past personal history component of the * * * evaluation.

"And examiners will utilize a part of this * * * data to prepare their reports, and it's not uncommon, this is done, especially in larger centers where * * * experts are more busy and they're seeing more cases, they often rely totally on the data collected by social workers in this regard.

"Q. Is this an accepted and customary practice in your profession?

"A. Yes, it is.

"Q. Is he also employed by the Forensic Diagnostic Center, of District Nine, Inc?

"A. He * * * He is the executive director."

When cross-examined about whether he based his opinion on Ryan's report, King testified as follows:

"Q. Dr. King, I would like to ask you, were any of the opinions that you gave here today based in any part on the information supplied by Mr. Ryan?

"A. No, other than to provide a background of information, about the Defendant's past history.

"Q. Okay. Were * * * were your * * * was your opinion here today based in any part upon that background history?

"A. No. Not the * * * ultimate question.

"Q. Was any part of your opinion based upon * * * your opinion as to * * * Mr. Underwood's sanity at the time of the alleged offense based upon that?

"A. No.

"Q. There's not really much reason for having him do that is there then?

"A. Sure there is.

" * * *

"A. Well, as I stated earlier, in order * * * in terms of the ultimate question of sanity, my opinion was not based on * * * the demographic information I received.

"Q. What * * * what's the purpose in receiving it then?

"A. It provides a background of information.

"Q. But you * * * but you don't base your opinion upon that?

"A. No."

The trial court overruled appellant's Evid.R. 703 objections that maintained King's opinion was based Ryan's report.

During closing arguments, the prosecutor made the following comments:

" * * * [Y]ou all have life experiences that I urge you to apply to the facts of this case, and to conclude that what the Defendant was handing you was baloney, it was garbage.

" * * *

"What you've got here is a Defendant that not only is trying every trick in the book, but also one that has a very selective memory.

" * * *

"He [Dr. Reardon] based his opinion really on alcohol, that this guy was drunk, therefore he's insane, and he had a bad childhood and he hates his mother in law, so he goes stabs somebody in a bar.

"That's baloney. That insults your intelligence, it's a joke. It's the worst mother in law joke I ever heard.

" * * *

"What he [Dr. Reardon] wants you to believe that * * * is that this guy attacked the bartender because he thought it was his mother in law, you know? That's kind of silly, it's really silly and it's a shame that a doctor with all that qualification would stand before you and actually try and convince you not only that this guy was insane, but that he's not guilty.

" * * *

"You've seen every trick in the book in this case, every trick in the book.

"I'm too drunk, I don't remember, I'm insane. It was my mother in law."

Appellant raised no objection to any of the above comments by the prosecutor.

## I

In his first assignment of error, appellant asserts the prosecutor's remarks during closing argument denied him a fair trial. Appellant further asserts that the court abused its discretion by failing to intervene in the matter.

First and foremost, we note appellant failed to object to the prosecutor's remarks. In *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710, the appellant similarly failed to object to the prosecutor's closing argument. The *Landrum* court quoted and followed *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus, as follows:

" 'A claim of error in a criminal case can not be predicated upon the improper remarks of counsel during his [closing] argument at trial, which were not objected to, *unless such remarks serve to deny the defendant a fair trial.*' " (Emphasis added.) *Landrum, supra,* 53 Ohio St.3d at 111, 559 N.E.2d at 717.

The *Landrum* court quoted and followed *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus, as follows:

"Notice of plain error under Crim. R. 52(B) is to be *taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.*" (Emphasis added.) *Landrum, supra,* 53 Ohio St.3d at 111, 559 N.E.2d at 717. See, also, *State v. Underwood* (1983), 3 Ohio St.3d 12, 14, 3 OBR 360, 361–362, 444 N.E.2d 1332, 1333–1334; *State v. Cooperrider* (1983), 4 Ohio St.3d 226, 227, 4 OBR 580, 580–581, 448 N.E.2d 452, 453.

■ The Ohio Supreme Court's decisions, *supra,* require that in order to sustain appellant's first assignment of error, we must find that (1) the prosecutor's remarks during closing argument served to deny appellant a fair trial, (2) the circumstances in the case *sub judice* are exceptional, and (3) reversal of the judgment below is required to prevent a manifest miscarriage of justice.

Appellant cites *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883, where the court held that improper remarks by the prosecution prejudicially affected the defendant's rights. In that case, the prosecutor referred to defense evidence as "lies," "garbage," and "a smoke screen." The prosecutor also intimated defense counsel had suborned perjury by creating lies to be presented in court. The court held that the prosecutor's conduct went "beyond the normal latitude allowed in closing arguments." *Id.* at 14, 14 OBR at 318–319, 470 N.E.2d at 885. Appellant urges us to consider the similarity between the remarks made by the prosecutor in *Smith* and the remarks made in the case *sub judice.*

Since *Smith,* the Ohio Supreme Court has decided many other closing-argument misconduct cases. In *State v. Maurer* (1984), 15 Ohio St.3d 239, 269, 15 OBR 379, 404–405, 473 N.E.2d 768, 794–795, the court, held that prosecutors must be given wide latitude during closing argument. The *Maurer* court held that the effect of any prosecutorial misconduct "must be considered in the light of the whole case." *Id.* at 266, 15 OBR at 402–403, 473 N.E.2d at 792–793.

In *State v. Rahman* (1986), 23 Ohio St.3d 146, 154, 23 OBR 315, 322–323, 492 N.E.2d 401, 409, the court recognized the fact that many attorneys

occasionally venture outside the evidence during closing argument. The *Rahman* court quoted *Dunlop v. United States* (1897), 165 U.S. 486, 498, 17 S.Ct. 375, 379, 41 L.Ed. 799, 803, as follows:

"If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, *even the most experienced of counsel are occasionally carried away* by this temptation." (Emphasis added.)

The *Rahman* decision repeated the *Maurer* pronouncement that prosecutors must be given wide latitude during closing argument.

In *State v. DePew* (1988), 38 Ohio St.3d 275, 288, 528 N.E.2d 542, 556–557, the court expressed alarm over the increasing incidence of attorney misconduct in capital cases, but declined to advocate wholesale reversal of cases involving prosecutorial misconduct. The court instead urged trial courts and appellate courts to refer matters of misconduct to the Disciplinary Counsel. The court wrote:

"While the prosecutorial misconduct in this case does not require a reversal of appellant's sentence, we express our mounting alarm over the increasing incidence of misconduct by both prosecutors and defense counsel in capital cases. * * * Time and again we see counsel misconduct which in many cases would appear to be grounds for reversal and the vacating of convictions and/or sentences. *In cases where the evidence of guilt is overwhelming and the statutory criteria have been met for both conviction and sentence of death, we have not chosen this alternative except in rare instances.*

"* * *

"In order to preserve the fairness of trial proceedings and to deter further misconduct, it is henceforth the intention of this court to refer matters of misconduct to the Disciplinary Counsel in those cases where we find it necessary and proper to do so. We encourage all trial courts and appellate courts to take similar steps where appropriate." (Emphasis added.) *Id.* at 288–289, 528 N.E.2d at 556–557.

Most recently, in *State v. Landrum, supra,* 53 Ohio St.3d at 110–111, 559 N.E.2d at 716–717, the Ohio Supreme Court reiterated the basic principles that (1) attorneys must be given latitude during closing argument, and (2) an attorney's remarks during closing argument must be viewed in the context of the entire argument. The court, at 112, 559 N.E.2d at 718–719, emphasized:

"* * * Not every intemperate remark by counsel can be a basis for reversal. *State v. Maurer* (1984), 15 Ohio St.3d 239 [15 OBR 379, 473 N.E.2d 768] * * *. The touchstone of analysis ' * * * is the fairness of the trial, not

the culpability of the prosecutor * * *.' *Smith v. Phillips* (1982), 455 U.S. 209, 219 [102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87–88]. The Constitution does not guarantee an 'error free, perfect trial * * *.' *United States v. Hasting* (1983), 461 U.S. 499, 508 [103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 105–106]. * * * "

■ We find no reversible error in the case *sub judice.* The remarks in *Smith* involved evidence outside the record and constituted direct, personal, ad hominem attacks on the defense counsel's integrity and, by implication, personal attacks on the defendant. By contrast, the prosecutor's remarks in the case *sub judice* addressed the quality of the expert testimony presented by the defense and the weight of the evidence.

More significantly, we believe the remarks by the prosecutor in the case *sub judice,* although imprudent, do not rise to the exceptional level necessary to constitute plain error. We do not believe reversal of the judgment below is required to prevent a manifest miscarriage of justice.

Therefore, for the foregoing reasons, appellant's first assignment of error is overruled.

## II

■ In his second assignment of error, appellant asserts the trial court erred by overruling his objections to King's expert opinion testimony. Appellant argues King's reliance on Ryan's report, and King's reliance on a statement appellant allegedly made to the arresting officer, violate Evid.R. 703. Evid.R. 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

In *State v. Jones* (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526, syllabus, the court strictly adhered to the rule:

"Pursuant to Evid.R. 703, facts or data upon which an expert bases an opinion must be those perceived by him or admitted in evidence at the hearing. * * * " See, also, *State v. Chapin* (1978), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317.

The *Jones* court rejected opinions of three experts who based their opinions in part on reports and medical histories not admitted in evidence and not prepared by the witnesses.

Appellee asserts that King did not base his opinion on Ryan's report. Appellee further asserts that it is possible for experts to review or observe information, yet not base their opinions on that information. In other words,

Evid.R. 703 does not require that *all* information reviewed by an expert either be perceived by him or be admitted in evidence at the hearing.

We agree with appellee in both respects. King expressly denied basing his opinion on Ryan's report. King interviewed appellant, and during the interview, obtained information directly from appellant. The trial court believed King when he stated that his opinion was not based on Ryan's report.

■ As an appellate court, we must refrain from reweighing the evidence where the trier of fact had the opportunity to hear the witnesses and observe their demeanor. See *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304; *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523; *State v. Thomas* (1982), 70 Ohio St.2d 79, 24 O.O.3d 150, 434 N.E.2d 1356.

Further, we agree that an expert witness does not necessarily "base" an opinion on every piece of information the expert reviewed prior to formulating the opinion. Webster's New Universal Unabridged Dictionary (2 Ed.1983) 154, defines the verb "base" as "to lay the base or foundation of." Black's Law Dictionary (5 Ed.1979) 138, does not define the verb "base," but defines the noun "base" as follows:

"Bottom, foundation, groundwork, that on which a thing rests."

Just as a builder might review many materials before selecting some to use as a building foundation, an expert might review many pieces of information before selecting some to use as an opinion foundation.

Although in the case *sub judice*, King did not base his opinion on the work of his assistant Ryan, and thus we have no Evid.R. 703 problem, we wish to comment on appellant's main assertion under this assignment of error. Appellant asserts that under Evid.R. 703, an expert may only base his opinion on work performed by his assistants if the assistants' work is either personally perceived by the expert or admitted into evidence.

Situations frequently arise where others assist an expert preparing to testify at trial. The *Jones* decision recites the language of Evid.R. 703 and appears to prohibit experts from basing their opinions on work performed by assistants. Several recent appellate cases, however, appear to have departed from the strict language of *Jones*.

In *Brant v. Benedict Enterprises, Inc.* (July 25, 1990), Hamilton App. Nos. C–890196 and C–890216, unreported, 1990 WL 103750, the court permitted an expert to base his opinion on estimates supplied to him by subcontractors. The estimates were not admitted into evidence. The *Brant* court wrote:

"In rendering his opinion, the expert is allowed, pursuant to Evid.R. 703, 'to base his opinion upon the data *supplied to him* or in evidence at the hearing.'

*Lanning v. Matlack* (Oct. 1, 1981), Cuyahoga App. No. 43068, slip op. [1981 WL 4531 at 12] (LEXIS) at 12." (Emphasis added.)

The *Lanning* case cited in *Brant* gave no explanation for its apparent incorporation of the words "supplied to him" into Evid.R. 703.

In *Ratka v. Cleveland Builders Supply Co.* (Aug. 10, 1989), Cuyahoga App. No. 55554, unreported, the court permitted an expert to base his opinion on tests performed by technicians under his direction and control. The tests were not admitted into evidence. The court wrote:

"This case is clearly distinguishable from *State v. Jones* (1984), 9 Ohio St.3d 123 [9 OBR 347, 459 N.E.2d 526], upon which appellant relies, as in Jones the expert witnesses based their opinions on reports they did not participate in preparing, which were prepared by independent parties, whereas, here, the expert witness testified concerning tests performed under his direction and control by technicians of his testing laboratory."

Although the *Ratka* court characterized its facts as distinguishable from *Jones,* we question whether *Ratka* is instead a departure from *Jones* and Evid.R. 703.

In *Camden v. Miller* (1986), 34 Ohio App.3d 86, 517 N.E.2d 253, the court decided an Evid.R. 401 relevancy issue, and did not mention Evid.R. 703. The court, however, touched on Evid.R. 703 as follows:

"Although Leinen testified that the mechanical steps of the HLA testing were delegated to technicians, he was the immediate supervisor, which suggest the jury could have inferred he closely monitored their work. Leinen testified that all the appropriate steps were taken in the handling and testing of the blood specimens.

"The trial court has broad discretion in the matter of admission or exclusion of expert testimony. * * *" *Id.* at 89, 517 N.E.2d at 256–257.

Perhaps the *Camden* court would permit expert opinions based on work performed by assistants closely monitored by the expert.

Other appellate cases have considered, but rejected the concept of permitting expert opinions based on work performed by others where that work is not admitted in evidence and not perceived by the expert. In *State v. Joseph* (July 24, 1985), Hamilton App. No. C–840751, unreported, 1985 WL 8947, the court disallowed an expert opinion partially based on tests administered by the expert's assistants. In *State v. Jones* (Feb. 24, 1983), Franklin App. No. 82AP–130, unreported, 1983 WL 3372, the court disallowed expert opinions partially based on various reports, histories and hospital records not admitted into evidence and not prepared by the witnesses. Both cases followed the strict Evid.R. 703 interpretation enunciated by the Ohio Supreme Court in

*Jones, supra,* and earlier in *Chapin, supra.* In his concurring opinion in the Franklin County appellate case, Judge Strausbaugh urged the Ohio Supreme Court to "reexamine and limit the breadth of the law set forth in *Chapin* by reversing this opinion."

Ohio's Evid.R. 703 differs significantly from the federal rule. The federal rule provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*" (Emphasis added.)

The Ohio rule omits the second sentence of the federal rule. Where experts in a particular field reasonably rely on work performed by their assistants, the federal rule permits the experts to base their opinions on that work without the necessity of having that work either admitted into evidence or personally perceived by the expert. It is clear that some courts have departed from *Jones* and from a literal reading of Evid.R. 703. Some jurists apparently believed the Ohio Supreme Court should re-examine *Jones* or amend Evid.R. 703 to conform with the federal rule.

Recently, the Ohio Supreme Court re-examined Evid.R. 703, *Jones* and *Chapin.* In *State v. Solomon* (1991), 59 Ohio St.3d 124, 570 N.E.2d 1118, syllabus, the court created a "major part" exception of Evid.R. 703:

"Where an expert bases his opinion, in whole *or in major part,* on facts or data perceived by him, the requirement of Evid.R. 703 has been satisfied." (Emphasis added.)

Justice Douglas, writing for a unanimous court, distinguished *Chapin* by noting that the psychiatrists in that case did not personally examine the defendant. Justice Douglas further wrote that although the court in *Jones* held that a medical opinion based upon reports not in evidence is not admissible, the court in *Jones* did not discuss the precise issue facing the court in *Solomon.* In *Solomon,* the two psychiatrists personally interviewed the defendant, but also reviewed police reports, medical reports, and hospital reports which were not admitted into evidence.

Appellant next asserts that King impermissibly based his opinion on a statement appellant allegedly made to the arresting officer. According to King, appellant told the officer that appellant "was sorry and did not mean to hurt anyone."

We note appellant failed to raise an objection to this alleged basis of King's opinion. Generally, a party waives his right to allege error on appeal when

that party did not object at the time the alleged error occurred. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated as to the penalty (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156; *State v. Ferrette* (1985), 18 Ohio St.3d 106, 18 OBR 139, 480 N.E.2d 399.

■ Further, as we discussed under appellant's first assignment of error, we cannot notice an error which a litigant failed to bring to the attention of the trial court unless the error constitutes plain error under Crim.R. 52(A). Appellate courts may notice plain error only under exceptional circumstances and only to prevent a gross miscarriage of justice.

■ We do not believe King's alleged reliance on appellant's alleged statement to the arresting officer constitutes plain error. The evidence in the record amply supports the conclusion that appellant knew the difference between right and wrong at the time of the crime.

Therefore, for the foregoing reasons appellant's second assignment of error is overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

STEPHENSON, P.J., and GREY, J., concur.