**HOYT, INC., Appellant,**

v.

**GORDON & ASSOCIATES, INC. et al., Appellees.**

[Cite as *Hoyt, Inc. v. Gordon & Assoc., Inc.* (1995), 104 Ohio App.3d 598.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 67443.

Decided June 13, 1995.

*Paul W. Ziegler*, for appellant.

*Eugene I. Selker* and *Harlan D. Karp*, for appellee Gordon & Assoc., Inc.

*David M. Jones*, for appellee Consolidated Biscuit Company.

NUGENT, Judge.

Plaintiff-appellant, Hoyt, Inc. ("Hoyt"), timely appeals from the decision of the Cuyahoga County Court of Common Pleas which granted the motions for summary judgment filed by defendants-appellees, Gordon & Associates, Inc. ("Gordon") and Consolidated Biscuit Company ("Consolidated Biscuit"). For the reasons that follow, we affirm the decision of the lower court.

Hoyt initiated the present action through the filing of its complaint on November 12, 1992. In count one, Hoyt alleged that defendant San Joaquin Figs, Inc. ("San Joaquin"), a California corporation engaged in the manufacture and sale of fig paste, breached an exclusive brokerage agreement with Hoyt wherein Hoyt was to serve as San Joaquin's exclusive broker of fig paste in Ohio and western Pennsylvania. Hoyt alleged that during the course of the brokerage agreement between Hoyt and San Joaquin, San Joaquin breached the agreement by entering into an exclusive brokerage agreement with Gordon wherein Gordon brokered future sales of San Joaquin's fig paste to Consolidated Biscuit. Hoyt also alleged that it had, in the past, brokered San Joaquin fig paste to Consolidated Biscuit. In counts two and three, Hoyt alleged that Gordon and Consolidated Biscuit tortiously interfered with Hoyt's exclusive brokerage contract with San Joaquin. Appellant demanded damages for breach of contract from San Joaquin[1] and compensatory and punitive damages from Gordon and Consolidated Biscuit for tortious interference with business relations.

Both Gordon and Consolidated Biscuit duly answered Hoyt's complaint, denying that they had tortiously interfered with Hoyt's business relations. Following discovery, Gordon and Consolidated Biscuit separately moved for summary judgment.

It is undisputed that Hoyt is an Ohio food broker which, on April 6, 1990, entered into an exclusive agreement with San Joaquin to broker San Joaquin's fig paste throughout Ohio and western Pennsylvania. According to Keith Jura,

---

1. Hoyt and San Joaquin subsequently entered into a settlement agreement wherein San Joaquin was dismissed from the suit with prejudice.

President of San Joaquin, the brokerage agreement was customary for the industry: exclusive, verbal, of an indefinite duration, with a requirement of thirty days' written notice for termination. Larry Hoyt testified at his deposition that, during the course of the agreement, Hoyt marketed some half million pounds of San Joaquin fig paste to Consolidated Biscuit and attempted to introduce San Joaquin products to other consumers.

In June 1991, Robert Oehler, an agent of Consolidated Biscuit, and Bud Gordon, principal of Gordon, visited San Joaquin. According to Jura, Oehler told him and Roy Jura (Keith Jura's father and another principal of San Joaquin) that Consolidated Biscuit would only accept, in the future, fig paste brokered through Gordon. It is further undisputed that Consolidated Biscuit is a very important consumer of fig paste; Consolidated Biscuit is the maker of Fig Newtons.

Keith Jura expressed his concern to Oehler and Bud Gordon that if San Joaquin agreed to use Gordon, it would violate San Joaquin's contract with Hoyt. In response, Oehler told the Juras that he would handle any problem with Hoyt. According to Jura, Bud Gordon, however, told Oehler that San Joaquin should handle any problems with Hoyt.

Eventually, in September or October 1991, Oehler informed Hoyt that Gordon would be acting as San Joaquin's fig paste broker. On October 15, 1991, San Joaquin signed an exclusive brokerage agreement with Gordon. Jura further testified that he never sent Hoyt written notice of termination of their brokerage agreement. In any event, Jura testified that Hoyt was notified before it made any effort to broker San Joaquin fig paste to anyone and before it had even contacted Consolidated Biscuit to inquire about its needs for the coming year.

In Consolidated Biscuit's motion for summary judgment, Consolidated Biscuit argued it had a legitimate business reason for brokering contracts for fig paste from Gordon rather than Hoyt. Consolidated Biscuit argued that Gordon had superior knowledge and understanding of the fig paste market so as to provide aggressive and knowledgeable assistance to Consolidated Biscuit in June 1991 and into the future. In short, Consolidated Biscuit argued that it was in its interest, as well as that of San Joaquin, that Gordon act as broker.

In Gordon's motion for summary judgment, Gordon argued that it did not act improperly and was privileged, as a direct competitor of Hoyt, to enter into the exclusive brokerage agreement with San Joaquin. Gordon summarized the evidence in support of its motion for summary judgment as demonstrating that it had superior knowledge of the fig paste market, worked harder and did a better job to the mutual benefit of San Joaquin and Consolidated Biscuit than did Hoyt. As a result, Gordon argued, it was privileged to interfere with Hoyt's business relationship with San Joaquin.

Based on the arguments and evidence presented by the parties, the trial court granted summary judgment in favor of both Consolidated Biscuit and Gordon. In its opinion and journal entry, the trial court found that San Joaquin's decision to terminate the oral brokerage agreement with Hoyt was based on San Joaquin's sound business judgment. The trial court further found that Gordon, as a competitor, had a privilege to interfere with San Joaquin's relationship with Hoyt.

Hoyt timely appeals, raising the following assignments of error for our review:

"I. The trial court erred in granting summary judgment to defendant, Consolidated Biscuit Company.

"II. The trial court erred in granting summary judgment to defendant, Gordon & Associates, Inc."

While Hoyt raises two assignments of error, Hoyt fails to separately argue each assignment. See App.R. 16(A)(7). Instead, Hoyt argues in three separate sections in the argument section of its appellate brief that summary judgment was inappropriate. Therefore, this court will first address the standard of review on a grant of summary judgment, then consider the appropriateness of granting summary judgment in favor of each appellee.

In reviewing a summary judgment, an appellate court conducts a *de novo* review of the trial court's decision. "A court reviewing the granting of a summary judgment must follow the standards set forth in Civ.R. 56(C) * * *." *Aglinsky v. Cleveland Builders Supply Co.* (1990), 68 Ohio App.3d 810, 814, 589 N.E.2d 1365, 1369. Civ.R. 56(C) provides that before summary judgment may be granted, it must be determined that:

"(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from such evidence that reasonable minds can come to but one conclusion and, reviewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 472, 364 N.E.2d 267, 274.

In reviewing a motion for summary judgment, the court must construe the evidence and all reasonable inferences drawn therefrom in a light most favorable to the party opposing the motion. *Morris v. Ohio Cas. Ins. Co.* (1988), 35 Ohio St.3d 45, 517 N.E.2d 904; *Harless v. Willis Day Warehousing* (1978), 54 Ohio St.2d 64, 8 O.O.3d 73, 375 N.E.2d 46. Because summary judgment represents a short cut through the normal litigation process by avoiding trial, summary judgment must be awarded with caution, resolving all doubts in favor of

the party opposing the motion. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 13 OBR 8, 467 N.E.2d 1378.

The burden of establishing that no genuine issues to any material fact remain to be litigated is on the party moving for summary judgment. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123, 1126; *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 120, 570 N.E.2d 1108, 1113. Once a party moves for summary judgment and has supported his or her motion by sufficient and acceptable evidence, the party opposing the motion has a reciprocal burden to respond by affidavit or as provided in Civ.R. 56(C), setting forth specific facts explaining that a genuine issue of material fact exists for trial. *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52, 567 N.E.2d 1027, 1031; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801. A motion for summary judgment forces the nonmoving party to produce evidence on all issues for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of syllabus.

The key to a summary judgment is that there must be no genuine issue as to any material fact. A "material fact" depends on the substantive law of the claim being litigated. *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202, 210–212; *Turner, supra.* Therefore, in determining whether a genuine issue of material fact remains to be litigated, we must turn our attention to the substantive law of the claims being litigated. Hoyt's cause of action against both appellees is for tortious interference with business relations.

In *Walter v. Murphy* (1988), 61 Ohio App.3d 553, 555, 573 N.E.2d 678, 679, the court of appeals set forth the following elements of tortious interference with business relations as clarified in 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:

"(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

"(b) preventing the other from acquiring or continuing the prospective relation." See, also, *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235, applying Restatement of the Law, Torts (1939) 63; *Madorsky v. Bernstein* (1993), 89 Ohio App.3d 550, 626 N.E.2d 694; and *Sonkin & Melena Co., L.P.A. v. Zaransky* (1992), 83 Ohio App.3d 169, 614 N.E.2d 807.

In the present case, it is indisputable that a genuine issue of fact exists as to whether Consolidated Biscuit and Gordon intentionally interfered with Hoyt's prospective contractual relation with San Joaquin by inducing San Joaquin to breach its agreement with Hoyt and enter into the exclusive brokerage agreement with Gordon in order to supply Consolidated Biscuit's fig paste needs. Initially, citing *Cincinnati Bengals, Inc. v. Bergey* (S.D.Ohio 1974), 453 F.Supp. 129, both Consolidated Biscuit and Gordon argue that there is no evidence that either defendant acted with malice in causing San Joaquin to breach its contract with Hoyt. However, Ohio courts hold that actual malice such as personal ill will, spite or hatred is not an essential element of the claim. *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219; *Reichman v. Drake* (1951), 89 Ohio App. 222, 45 O.O. 444, 100 N.E.2d 533; *MPS Trimco, Inc. v. Lewis* (Feb. 18, 1993), Cuyahoga App. No. 61829, unreported, at 7, 1993 WL 39921. Instead, malice, as used in connection with this cause of action and in absence of a qualified privilege, denotes an unjustified or improper interference with the contractual or business relationship. *Elwert, supra; Reichman, supra;* see, also, *Province v. Cleveland Press Publishing Co.* (C.A.6, 1986), 787 F.2d 1047.

At the very least, a genuine issue of fact exists as to whether Consolidated Biscuit and Gordon intended to interfere with Hoyt's business relations with San Joaquin. The deposition testimony of Keith Jura indicates that in June 1991, Robert Oehler and Bud Gordon met with Keith and Roy Jura of San Joaquin. According to Keith Jura, Consolidated Biscuit, through its agent Robert Oehler, told Keith and Roy Jura that Consolidated Biscuit would only accept in the future fig paste brokered by Gordon. Moreover, Keith Jura expressed his concern that if San Joaquin agreed to use Gordon, it would violate its contract with Hoyt. In response, Oehler told the Juras that he would handle any problems with Hoyt; Bud Gordon, however, suggested that San Joaquin should handle Hoyt. Finally, in September or October 1991, Consolidated Biscuit informed Hoyt that Gordon would be acting as San Joaquin's exclusive broker.

The issue then, with respect to both Consolidated Biscuit and Gordon, narrows down to whether each defendant "improperly" interfered with Hoyt's prospective business relations with San Joaquin. The issue of whether each defendant "improperly" interfered with Hoyt's business relations is blurred somewhat by the uniqueness of the present tort, which renders some intentional interference with business relations non-actionable as privileged conduct. In short, there is no clear-cut distinction between the requirements of a prima facie case and the requirements of a recognized privilege. Whether the burden of proving or disproving that a defendant's intentional interference with business relations is privileged and, therefore, not "improper" is an issue this court need not decide, since in the present case, each defendant produced evidence on summary

judgment that its conduct was privileged and, therefore, not "improper." As a result, Hoyt was required to produce evidence that each defendant's conduct was *not* privileged and, therefore, improper. *Wing, supra.*

■ Consolidated Biscuit argues that it was justified and acted properly in protecting its own legitimate business interests in procuring fig paste solely through Gordon and to the exclusion of Hoyt.

Section 767 of the Restatement of Torts 2d, *supra,* at 26–27, provides the factors to be considered in determining whether the interference is improper:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

"(a) the nature of the actor's conduct,

"(b) the actor's motive,

"(c) the interests of the other with which the actor's conduct interferes,

"(d) the interests sought to be advanced by the actor,

"(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

"(f) the proximity or remoteness of the actor's conduct to the interference and

"(g) the relations between the parties."

■ We note that Section 767 of the Restatement embraces the "privilege" as outlined in *Juhasz* and *Zaransky, supra.* In some instances, advancement of bona fide business interests is not improper interference. *Bowman v. Marshall* (Oct. 22, 1990), Montgomery App. No. 11816, unreported, 1990 WL 162578. In this regard, a recognized privilege is inducement to influence another's business policy. 4 Restatement of the Law 2d, Torts (1979) 48, Section 771 provides a special application to determine whether an actor's conduct is proper and, thereby, privileged. Section 771 provides:

"One who intentionally causes a third person not to enter into a prospective contractual relation with another in order to influence the other's policy in the conduct of his business does not interfere improperly with the other's relation if

"(a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and

"(b) the desired policy does not unlawfully restrain trade or otherwise violate an established public policy and

"(c) the means employed are not wrongful."

In the present case, we believe Consolidated Biscuit did not act improperly and was, therefore, privileged in causing San Joaquin to discontinue its brokerage agreement with Hoyt. The record before this court reveals that Consolidated Biscuit acted to influence San Joaquin's business policy concerning San Joaquin's future performance of brokerage agreements as it relates to Consolidated Biscuit's purchase of fig paste. Thus, Consolidated Biscuit has an economic interest in who provides brokerage services to San Joaquin. The record further shows that Hoyt was not meeting Consolidated Biscuit's needs for fig paste. Consolidated Biscuit points out that in 1990 Hoyt supplied only five hundred thousand pounds of fig paste, an amount which falls far short of the amount needed by Consolidated Biscuit; that Gordon provided more knowledge of the fig paste market than did Hoyt; and that in 1991, Hoyt had yet to contact Consolidated Biscuit while Gordon had provided useful insights into the upcoming market and allowed Consolidated Biscuit to move in the supplier's market and purchase its needs of fig paste early on.

It is not disputed that in October 1990, Hoyt had brokered five hundred thousand pounds of fig paste from San Joaquin to Consolidated Biscuit. However, according to the deposition testimony of Robert Oehler, Consolidated Biscuit used many times that quantity of fig paste annually to make fig bars. Moreover, according to Oehler, in June 1991, Consolidated Biscuit was advised by Gordon that the anticipated fig paste crop from California for that year would be inadequate to meet the needs of the market. Oehler testified that he became very concerned about his ability to purchase enough fig paste to meet his company's needs.

As a result of the anticipated shortage, Oehler traveled to California with Bud Gordon to meet fig paste suppliers in order to purchase enough fig paste to meet Consolidated Biscuit's needs. Jura's deposition testimony confirms that Gordon was providing Consolidated Biscuit with an essential business service:

"Q. And isn't it true, Mr. Jura, that in Consolidated Biscuit's situation, they much preferred to use the product from Fresno, California rather than a product from Turkey or Greece?

"A. That's true.

"Q. You've been asked a couple questions just a few moments ago about whose best interest it was in to contract early or late in 1991; I'm going to ask you: Was it in Bob Oehler's interest to contract early in 1991, that is, say, in June of 1991, as opposed to October 1991?

"A. Yes.

"Q. And why is that?

"A. Because he needed to procure more product than he had been getting in California. And by coming in early, he had a better chance to get what he needed.

"Q. And, in fact, you didn't hear anything from Larry Hoyt about the 1991 fig paste crop as it might apply to selling to Consolidated until sometime in September or October of 1991; is that right?"

At the June 1991 meeting, Oehler learned that San Joaquin could supply two million pounds of much needed fig paste to Consolidated Biscuit from the 1991 crop.

By the time Oehler had met with the Juras and Gordon, Oehler had decided that it was in the best interest of Consolidated Biscuit to broker all orders of fig paste through Gordon, rather than through Hoyt, because Gordon was a more knowledgeable and responsive broker and had a greater knowledge of the fig paste market and of the producers than did Hoyt. Oehler testified:

"A. I had said earlier that I was pleased and impressed with Gordon & Associates' ability to provide me with market information and insight as to what was happening in the market place. I didn't have any particular need or interest to seek any other brokers for domestic fig paste."

And further:

"A. Yes, they [sic] were concerns that I had that Larry [Hoyt] was not as well versed with fig paste and with the fig paste market and what was happening in the fig paste market and as I needed to have access to. I needed somebody who could—

" * * *

"Q. You said concerns, I said complaints. Did you have any complaints about Hoyt or its services?

"A. Yes.

"Q. What were they?

"A. Personally I had an unvoiced complaint about a lack of service relative to the account since an employee of Hoyt, Inc. named Ron Fulkerson had left."

Keith Jura readily agrees that Gordon was more knowledgeable and responsive than was Hoyt and that these attributes were important not only to buyers such as Consolidated Biscuit but also to sellers such as the Juras. Jura, who had previously used Gordon's services, testified that during 1991, their interests were served well by Gordon but were not served well by Hoyt:

"A. Yes. Mr. Gordon did have—does have a good knowledge of the California fig industry, and knew the industry within California very well, which was not common for brokers.

"Q.  Did he also know the market in the rest of the country?

"A.  Yes, he did.

" * * *

"Q.  And would you tell the jury, in your own words, what kind of a broker he was?

"A.  In that regard he was a very good broker.  He was involved in great detail.  He followed through very well, I believe, for both broker—or for both seller and buyer, and provided us with a lot of input and a lot of information.

" * * *

"A.  Nobody else was able to.  Well, we felt that it was because Mr. Gordon did a lot of background work early in the year, and he had a good relationship with his—or with the customer, and was able to bring the customer and ourselves together to our mutual benefit.

"Q.  And would you say that was of an important benefit to you as a processor?

"A.  Yes.

"Q.  And among the reasons was it important that it helped you in planning your budget and financing?

" * * *

"A.  He didn't say anything.  By the fact that he was instrumental in bringing this additional business to us, that—that certainly influenced us to—to change our relationship or—or end our relationship with Mr. Hoyt.

"Q.  Okay.  And the reason you ended your relationship with Mr. Hoyt, then, was because Mr. Gordon brought to you more business;  is that what you're saying?

"MR. ZIEGLER:  Objection.

"THE WITNESS:  That's true, yes.

" * * *

"Q.  That is, he brought more business, more knowledge and experience in the industry;  right?

"A.  Yes.

"Q.  And would you compare the things that he brought, by way of knowledge and experience as a broker, to what you had seen from Mr. Hoyt as to his knowledge and experience as a broker in the fig paste industry?  Would you compare that for the jury, please?

"A. Mr. Gordon, as I believe I mentioned earlier, was much more knowledgeable of the California fig industry from within California; that is, as to know basically what the tonnages were, who the players were, who the growers were, where growers were aligned, that is, which packers they were dealing with; that type of thing. He knew—he seemed to know the other processors and know a little bit about what they were doing.

"* * * *

"Q. And in the case of 1991, were your interests served well by Bud Gordon?

"A. Yes.

"Q. In the year 1991 were your interests served well by the brokerage efforts of Larry Hoyt?

"A. No."

Keith Jura agrees that Oehler was justifiably concerned about obtaining enough domestic fig paste from the 1991 fig paste crop to satisfy Consolidated Biscuit's needs and that Gordon had alerted both Consolidated Biscuit and San Joaquin to the short position that was expected in the fig crop that year. Keith Jura also admitted that because it was a seller's market and, because he knew he could have sold his fig paste to buyers other than Consolidated Biscuit, he had no fear that if he did not sell to Consolidated Biscuit, he would not be able to dispose of all of his fig paste. Consequently, nobody "pressured" him into selling to Consolidated Biscuit. The reason the Juras ended their relationship with Hoyt was simply because it was in their best interest to do so.

Because Gordon was better able to meet the needs of both Consolidated Biscuit and San Joaquin, Consolidated Biscuit had a clear stake and economic interest in influencing San Joaquin to broker its fig paste through Gordon.

Moreover, there is no evidence to suggest that Consolidated Biscuit's actions or policy constituted an unlawful restraint of trade or violated an established public policy. Jura readily acknowledged that in 1991, it was a seller's market and that if he did not sell his fig paste to Consolidated Biscuit, he would be able to sell his fig paste elsewhere.

For the same reason, there exists no evidence that Consolidated Biscuit employed wrongful means in brokering its fig paste contracts solely through Gordon. As previously stated, in a seller's market, San Joaquin was not pressured into using Gordon and, if they did not use Gordon, Jura believed he would, nonetheless, be able to dispose of all of his fig paste.

Having produced the above evidence, it is incumbent upon Hoyt to produce evidence to raise a material issue of fact that Consolidated Biscuit employed improper means or otherwise acted without privilege in causing San Joaquin to breach its brokerage contract with Hoyt. *Madorsky, supra,* 89 Ohio App.3d at 553–554, 626 N.E.2d at 696, citing *Wing, supra,* paragraph three of the syllabus. To this end, Hoyt fails to produce any evidence that Consolidated Biscuit employed improper means or otherwise acted without privilege. Hoyt further fails to produce evidence that he was meeting, or even taking steps to meet, the needs of Consolidated Biscuit in procuring fig paste or brokering fig paste on behalf of San Joaquin.

Citing Comment *b* of Section 771 of the Restatement of Torts, *supra,* Hoyt raises the argument that Section 771 "does not apply to the causing of a breach of contract." That comment goes on to state that "[t]his does not mean to imply, however, that the actor's interference is necessarily improper in such case under the general principle stated in § 767 (which applies to breach of contracts or prospective contractual relations)." In the present case, it is important to note that the brokerage agreement between Hoyt and San Joaquin was an at-will agreement. In short, it was an indefinite, exclusive brokerage agreement which was terminable at will with thirty days' notice. More important, however, there is no evidence that Hoyt had brokered any contracts for fig paste on behalf of San Joaquin at the time in which Hoyt was notified that the contract was terminated. Therefore, the relationship between San Joaquin and Hoyt was prospective in nature, and Hoyt's only interest was anticipatory. Hence, Consolidated Biscuit's conduct did not cause an immediate breach of a contract to sell fig paste.

Accordingly, we conclude that Consolidated Biscuit did not act improperly and was otherwise privileged in influencing San Joaquin to breach the relevant brokerage agreement with Hoyt. Consolidated Biscuit set forth legitimate business interests in order to influence San Joaquin's policy concerning the brokering of fig paste contracts. The record clearly shows that Gordon's services were superior to Hoyt's to the benefit of both Consolidated Biscuit and San Joaquin. Furthermore, there is no evidence that Consolidated Biscuit's actions constituted an unlawful restraint of trade or violated an established policy nor can it be said that the means employed by Consolidated Biscuit were wrongful. Any limited economic pressure applied by Consolidated Biscuit was neutralized by the fact that San Joaquin sold its fig paste in a seller's market. The fact that Hoyt's relationship with San Joaquin was at will and that Hoyt had yet to take any steps to meet the business needs of Consolidated Biscuit or San Joaquin and broker any contracts between the parties undermines its claim that Consolidated Biscuit tortiously interfered with its relationship with San Joaquin.

The trial court, therefore, properly granted summary judgment in Consolidated Biscuit's favor on Hoyt's claim for intentional interference with business relations.

■ We shall next consider Hoyt's claim for intentional interference with business relations against Gordon.

In support of summary judgment, Gordon claimed its conduct was not improper and was otherwise privileged as a business competitor of Hoyt. Section 768 of the Restatement of Torts, 2d, *supra*, at 39, provides the following factors to be used in determining whether competition is proper or improper interference:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

"(d) his purpose is at least in part to advance his interest in competing with the other.

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will." See, also, *Walter*, 61 Ohio App.3d at 556, 573 N.E.2d at 679; and *Cleveland Growers Marketing, Inc. v. Greenberg* (May 20, 1993), Cuyahoga App. No. 62473, unreported, 1993 WL 172970 (competitive bidding situations are considered privileged absent wrongful means or an unlawful restraint of trade).

Competitive bidding situations include prospective purchasers competing for the lowest bid to purchase real estate, *Walter* and *Greenberg, supra*; insurance brokers competing for renewal of insurance policies, cf. *Elwert, supra*; a client's unfettered right to hire and fire the attorney of his or her choice, *Madorsky, supra*, and *Zaransky, supra*; and distributors competing for the right to distribute a manufacturer's products, *Kand Med., Inc. v. Freund Med. Products, Inc.* (C.A.6, 1992), 963 F.2d 125.

In the present case, Hoyt readily acknowledged that Gordon is a competitor. Moreover, Hoyt acknowledged that there is no evidence that Gordon's actions led to an unlawful restraint of trade and that Gordon's purpose in obtaining the

termination of Hoyt's contract with San Joaquin was to advance Gordon's competitive interests. This court agrees.

Hoyt argues that there are genuine issues of material fact that the contract was breached rather than terminated since Hoyt never received written notice from San Joaquin terminating the contract. Hoyt also claims Gordon used "wrongful means" by having Consolidated Biscuit exert economic pressure on San Joaquin to terminate its contract with Hoyt. However, we have already concluded that Consolidated Biscuit did not act improperly in the present case; therefore, we reject Hoyt's argument that Gordon somehow acted improperly through Consolidated Biscuit.

We also conclude that the privilege of competition protects Gordon from liability as the San Joaquin/Hoyt brokerage agreement was terminable at will. *MPS Trimco, supra; Emery Enterprises, Inc. v. Std. Plumbing & Heating Co.* (Dec. 30, 1988), Richland App. No. CA–2615, unreported, 1988 WL 142865. Therefore, "any interference with [an at-will contract] that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by choice of the third person there is no breach of it." Comment *i* to 4 Restatement of Torts, Section 768, *supra,* at 44.

In the present case, it is undisputed that the brokerage agreement was terminable at will and that Hoyt had presented no legal interest, such as a brokered contract for which he remained uncompensated, but only an expectancy of continued relations. Therefore, San Joaquin's termination did not amount to a breach for present purposes. We have already pointed out that Hoyt was notified of the termination before he made any effort to broker San Joaquin fig paste to anyone and before he had contacted Consolidated Biscuit to inquire about its needs for the coming year. Hoyt fails to dispute this fact and fails to submit any evidentiary materials demonstrating that he did contact San Joaquin to broker its fig paste or that he did contact Consolidated Biscuit to inquire of its upcoming needs.

The present case is indistinguishable from *Kand, supra,* wherein the Sixth Circuit Court of Appeals applied Ohio law and the factors enumerated in Section 767 of the Restatement of Torts 2d, *supra,* to hold that Mansfield Scientific, Inc., a distributor of medical supplies, was privileged, as a competitor of the plaintiff, to induce a third-party manufacturer of medical supplies to breach a previous distributorship agreement with plaintiff and enter an exclusive distributorship agreement with Mansfield. The court of appeals wrote:

"Ohio has demonstrated that it highly values competitive enterprise and, while such enterprise is not permitted where illegal, here Mansfield believed Freund could validly terminate its agreement with the current distributors because Freund had indicated that it was dissatisfied with the distributors' performance. There is no evidence in the record of improper purpose or motive on Kand's part, only that Kand had significant business reasons for its conduct." *Id.*, 963 F.2d at 128.

In the present case, San Joaquin could validly terminate its brokerage agreement with Hoyt with thirty days' notice. Moreover, both San Joaquin and Consolidated Biscuit were dissatisfied with Hoyt's performance, and San Joaquin made a reasonable business decision to terminate the brokerage agreement. Finally, Hoyt was notified of the termination prior to having made any effort to broker San Joaquin's fig paste.

Based on the foregoing, this court concludes the trial court properly granted Gordon summary judgment on Hoyt's claim for tortious interference with business relations. Gordon's actions were not improper and were otherwise privileged as being in furtherance of Gordon's competitive interests in the food brokerage industry. Moreover, the sole interest Hoyt had with San Joaquin was an at-will relationship, anticipatory in nature, which was effectively terminated prior to Hoyt taking any action to broker San Joaquin fig paste to Consolidated Biscuit or anyone else in 1991.

Hoyt's sole assignment of error is overruled, and the judgment of the lower court is affirmed.

*Judgment affirmed.*

PATTON, C.J., and KARPINSKI, J., concur.