SCARABINO, Appellant,

v.

EAST LIVERPOOL CITY HOSPITAL, Appellee.

Court of Appeals of Ohio,
Seventh District, Columbiana County.

No. 03 CO 4.

Decided Dec. 26, 2003.

Mark S. Colucci, for appellant.

Baker & Hostetler, L.L.P., Karen B. Newborn and Todd H. Lebowitz, for appellee.

---

DeGenaro, Judge.

{¶ 1} This matter comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments to this court. Appellant, Sherry Scarabino, appeals from the judgment of the Columbiana Court of Common Pleas granting summary judgment in favor of appellee, East Liverpool City Hospital, on her claims of intentional infliction of emotional distress and harassment in violation of public policy. The issues we must resolve are (1) whether the hospital's behavior of repeatedly asking Scarabino, a migraine sufferer, how she was feeling and then sending her to a rehabilitation center for treatment constituted extreme and outrageous conduct; and (2) whether a union member subject to a collective bargaining agreement can make a claim of harassment against public policy.

{¶ 2} First, to establish a claim of intentional infliction of emotional distress, Scarabino was required to show (1) that the defendant intended to cause the plaintiff serious emotional distress; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress. Because Scarabino has failed to present evidence of extreme and outrageous conduct, we affirm the judgment of the trial court with respect to that claim. Second, before Scarabino could properly make a claim for harassment against public policy, she had to prove that she was an employee at will and not subject to a collective bargaining agreement. Because Scarabino was a member of a union, the trial court properly granted summary judgment on that claim. According, we affirm the judgment of the trial court dismissing Scarabino's claims.

Facts and Standard of Review

{¶ 3} Scarabino, a severe migraine sufferer whose attacks caused her to be either late to work or call off, began working at the hospital in 1979 in a clerk's position. Soon after she began working for the hospital, she joined the union. She worked off and on in the ER of the hospital, three times in all. During her employment, Scarabino did not like the setup of the ER because there was no triage area, so she complained to Jan Stockdale, a supervisor, during the second period of time she worked in the ER. She also complained to Mr. Brock, the vice president of the hospital.

{¶ 4} The third time Scarabino was working in the ER, the hospital had created a triage area that was blocked off from the lobby. Scarabino thought that it was difficult to get the patients into the triage area behind the desk and register patients at the same time. She complained about the triage setup to Jan Stockdale, Gail Steininger, hospital director, Reverend Parry, the compliance officer, and Connie Smith, a supervisor.

{¶ 5} She met with Judith Dunlap, the president of the board, to discuss her concerns about the setup of the ER. After this discussion with Judith, a meeting was scheduled so that all of the registration clerks could voice their opinions. After the meeting, Scarabino claims that she was harassed by her superiors. As a result of the hospital's behavior, Scarabino claims that she suffered a nervous breakdown and is no longer able to work because of her nerves and her depression. Scarabino filed suit against the hospital, asserting two causes of action. First, Scarabino claims that the actions of the hospital constituted the intentional infliction of emotional distress. Second, Scarabino claims that the conduct of the hospital was in retaliation for her efforts to protect the public from an unsafe environment. The trial court granted the hospital summary judgment on both of these claims.

{¶ 6} In reviewing an award of summary judgment, appellate courts must apply a de novo standard of review. *Cole v. Am. Indus. & Resources Corp.* (1998), 128 Ohio App.3d 546, 552, 715 N.E.2d 1179. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper. Civ.R. 56(C) provides that the trial court shall render summary judgment if no genuine issue of material fact exists and when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377. A "material fact" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.* (1995), 104 Ohio App.3d 598, 603, 662 N.E.2d 1088, citing *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 247–248, 106 S.Ct.

2505, 91 L.Ed.2d 202. Both of these claims were summarily dismissed by the trial court.

{¶ 7} As her first assignment of error, Scarabino alleges:

{¶ 8} "The version of the plaintiff's facts, which are to be given liberal review with all doubt resolved in favor of the plaintiff for purposes of summary disposal attempts of claims brought by litigants under Rule 56, clearly present a difference of factual assertions upon which reasonable minds could differ, thus precluding summary judgment based upon the claim of intentional infliction of emotional distress."

{¶ 9} Scarabino specifically argues that the trial court erred by summarily dismissing her claims for intentional infliction of emotional distress and harassment in violation of public policy. We will address her specific arguments in order.

### Intentional Infliction of Emotional Distress

[1] {¶ 10} In *Phung v. Waste Mgt., Inc.* (1994), 71 Ohio St.3d 408, 410, 644 N.E.2d 286, the Ohio Supreme Court held that in order to prove intentional infliction of emotional distress, a plaintiff must show "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." In defining "extreme and outrageous" conduct, the Supreme Court of Ohio adopted the definition provided in the Restatement of the Law 2d, Torts, and stated that liability has been found only where the conduct has been so outrageous that it goes beyond all possible bounds of decency and is so atrocious that it is "utterly intolerable in a civilized community." *Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 153, 10 OBR 485, 462 N.E.2d 392.

{¶ 11} With regard to the "extreme and outrageous" conduct standard set forth in the second prong of *Phung,* it appears that only rarely will offensive conduct reach the level necessary to support a claim for intentional infliction of emotional distress. As stated by the Second District, "Only the most extreme wrongs, which do gross violence to the norms of a civilized society, will rise to the level of outrageous conduct." *Brown v. Denny* (1991), 72 Ohio App.3d 417, 423, 594 N.E.2d 1008. Consequently, many courts, including this one in *Spence v. Maiorca* (Sept. 27, 2002), 7th Dist. No. 01APO762, 2002 WL 31163581, have found it appropriate to summarily dismiss cases as a matter of law when the alleged behavior does not meet the requisite standard. See *Haefka v. W.W. Extended Care* (Nov. 28, 2001), 9th Dist. No. 01CA007863, 2001 WL 1509200; *Petrarca v. Phar–Mor, Inc.* (Sept. 21, 2001), 11th Dist. No. 2000–T–0121, 2001 WL 1117015; *Miller v. Xenia* (Mar. 22, 2002), 2d Dist. No. 2001 CA 82, 2002 WL 441386; *Gertz*

*v. Nerone & Sons, Inc.*, 8th Dist. No. 80422, 2002-Ohio-3782, 2002 WL 1728594; *Oglesby v. Columbus*, 10th Dist. No. 01AP–1289, 2002-Ohio-3784, 2002 WL 1726033; *Holzbach v. Jackson Twp.* (July 26, 2000), 5th Dist. No. 1999 CA 00373, 2000 WL 1035798; *Unger v. Grundish* (Sept. 18, 2000), 4th Dist. No. 00 CA 03, 2000 WL 1354396.

{¶ 12} It must be reiterated that the Ohio Supreme Court set a very high bar for recovery for this type of claim. In *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666, the Supreme Court described extreme and outrageous conduct as follows:

{¶ 13} "* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

{¶ 14} "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. See Magruder, Mental and Emotional Disturbance in the Law of Torts, [49] Harvard Law Review 1033, 1053 (1936). * * *" Id. at 374–375, 6 OBR 421, 453 N.E.2d 666.

{¶ 15} When this standard is applied to the facts in this case, it becomes clear from Scarabino's own description of the hospital's behavior that the alleged harassment was nothing more than repeated attempts at helping Scarabino. Although Scarabino may have found this behavior to be irrational, no reasonable person would classify the behavior as outrageous.

{¶ 16} More specifically, during the course of discovery, Scarabino was questioned regarding the behavior she claimed to be the basis of her lawsuit, namely the harassment. When asked whether she was talking about the write-ups she had for reporting off due to her migraines, she responded, "Yes." When asked how else she was harassed, Scarabino responded:

{¶ 17} "So, after I went to Judith Dunlap, my boss, Jan Stockdale, would continuously come over to my area and watch over me and ask me like: Sherry, you're missing a lot of work."

{¶ 18} When asked if the only way Jan harassed her was asking about her report-offs, Scarabino responded:

{¶ 19} "Not only that, but she came up to my registration area which was abnormal for her to do, unless she was going to carry on a friendly conversation, and she would watch behind my shoulder, which also was out of the ordinary, and when I was finished typing in a patient, she would say: Sherry, isn't there anything these doctors can do for you? Sherry, you're missing a lot of work. Sherry, I hate to see you lose your job.

{¶ 20} "So, I finally turned to her and said: Jan, telling me and threatening me of losing my job isn't going to help my migraines go away. So, then, it wasn't too long after that, a few days—so, it really made me nervous. I mean, I thought: I can't do my job with her doing this. She's harassing me all of a sudden, and I knew that it was coming from higher up, because Jan was not that type of person. Jan was my friend. I could go to Jan and give her—"

{¶ 21} When questioned whether Jan mistreated her by saying "can't the doctors do anything to treat you so you won't miss so much work?", Scarabino responded:

{¶ 22} "I said she harassed me because she kept repeating it over and over and interrupting me during my job of registering patients. She would stand behind me and watch over me until I was finished, and then she would start."

{¶ 23} Scarabino also testified that Jan harassed her by saying that she and Gail Steininger were given a certain amount of time to solve the triage problem or it was "their ass." When asked in what way she was harassed by Darwin Smith, she responded:

{¶ 24} "Shortly after the meeting with Mike Winiarski, he called me down in the middle of a morning while registering a patient. He called me into his office with Jan Stockdale and Eleanor Salter, and when I walked in, he handed me a piece of paper, and he said: you are to report to Gateway Center up in Beaver somewhere, and I said: what is this for? And he said: because we're concerned of—we're concerned at the behavior of you—of a 21-year employee. We're concerned because you're reporting off and your behavior, and I said: but I've been in your office how many times. You know everything. You know that— that I'm sick with migraines. I see my own doctors. Why would you want me to start over with another doctor, you know? Why now after I went—after the meeting with Mike and Judith? Why right then? Why not five years ago when I was reporting off? He couldn't answer. I said: what made you decide to do

this? And he said: I consulted with someone outside the hospital. And I said: who? And he said: I can't tell you. And I asked him: have you sent anyone else from the hospital to this place? And he said: I can't tell you that. And I said: I don't want to know the names. I just want to know if I'm the first person you've ever done this to. He said: again, I can't say."

{¶ 25} She later testified that she thought Darwin was harassing her because he sent her to the Gateway Employee Assistance Program based upon her reporting off work at the last minute. She thought that Darwin was also responsible for the later request at Gateway that she take a urine test. She thought the request was harassment and refused to submit to one. In addition, Scarabino testified that Darwin harassed her by saying that her accumulated 42 package days to be used for sick, personal, or vacation time could not be used for sick time. He told her that she was on a schedule and was expected to be at work at her scheduled times. Scarabino further testified that Darwin harassed her by not offering her the "FMLA medical plan" when other employees were already participating in the plan. Scarabino later admitted that Darwin later granted her the FMLA leave. When asked whether there was any other way that Darwin harassed her, she answered:

{¶ 26} "Him trying to make me go to that Gateway Center was basically the end of my employment. He—that caused me to basically go—well, I went into such a deep, deep depression after that when I walked out sick that day."

{¶ 27} However, Scarabino also testified that after she returned from Gateway, she went to speak with Jan about the experience. She said that Jan was caring and compassionate towards her, like she wanted to help. Scarabino testified that Jan got up and gave her a hug. Scarabino told Jan, "thanks for caring." Scarabino then testified that she was appreciative that Jan cared about her.

{¶ 28} Based on this evidence, the hospital moved for summary judgment on the intentional-infliction-of-emotional-distress claim, arguing that the hospital's behavior as described by Scarabino was not even "remotely close" to the "extreme and outrageous conduct" required to support such a claim. The hospital argues that, essentially, Scarabino is claiming that her supervisors' questions about how she was feeling and the Human Resource Manager's referral to the Employee Assistance Program were merely attempts to help Scarabino.

{¶ 29} The hospital argues that Scarabino has failed to produce any evidence of three out of the four elements needed to prove intentional infliction of emotional distress. First, the hospital claims that Scarabino failed to show evidence that the hospital intentionally tried to cause her emotional distress. Second, the hospital claims that Scarabino failed to show evidence of any extreme and outrageous conduct. And, third, the hospital claims that Scarabino has failed to

demonstrate that the hospital's harassment was the cause of her emotional distress.

{¶ 30} The hospital is correct in its assertions that its behavior was neither extreme nor outrageous, even when viewed in a light most favorable to Scarabino. Surprisingly, even Scarabino concedes in her brief in opposition to summary judgment that an ordinary person would not be offended or troubled by the hospital's behavior. However, Scarabino argues:

{¶ 31} "[T]he ordinary person standard cannot be used to determine if the Defendant's conduct was extreme and outrageous. Instead, you must look at, given the facts and circumstances of the herein case, was the Defendant's conduct extreme and outrageous? The answer is yes. The Plaintiff is, and has been, in a delicate emotional and psychological state."

{¶ 32} Regardless, the hospital employees did nothing but attempt to help Scarabino either by seeking treatment for her illness or granting her leave so that she could stay home when she could not make it in to work. It appears that no reasonable fact-finder could say that the hospital's behavior went beyond all possible bounds of decency. In fact, it appears that the opposite would be true. As Scarabino has failed to meet this element of a claim for intentional infliction of emotional distress, the claim fails in its entirety. Accordingly, the trial court properly granted summary judgment on this claim.

### Harassment in Violation of Public Policy

{¶ 33} Scarabino next claims that the trial court improperly summarily dismissed her claim for harassment in violation of public policy. In *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, at paragraph one of the syllabus, the Supreme Court held that "[p]ublic policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." But to establish a claim for tortious violation of public policy, a plaintiff has to plead and prove that she was an employee at will. See *Haynes v. Zoological Soc. of Cincinnati* (1995), 73 Ohio St.3d 254, 652 N.E.2d 948, syllabus. See, also, *Noday v. Mahoning Cty. Sheriff* (2002), 147 Ohio App.3d 38, 768 N.E.2d 726; *Surry v. Cuyahoga Community College*, 149 Ohio App.3d 528, 2002-Ohio-5356, 778 N.E.2d 91; *Wiegerig v. Timken Co.* (2001), 144 Ohio App.3d 664, 761 N.E.2d 118; *Kulak v. Mail–Well Envelope Co.* (Aug. 31, 2000), 8th Dist. No. 76974, 2000 WL 1231486. Scarabino cannot. The evidence clearly indicates that she was a member of a union and subject to a collective bargaining agreement; thus, she clearly was not an at-will employee.

{¶ 34} Moreover, Scarabino did not allege or prove that she was discharged or otherwise disciplined in violation of public policy. Instead, the

essence of her claim was that she was harassed in violation of public policy. "Neither *Greeley* nor its progeny have recognized a tort for harassment in violation of public policy." *Bell v. Cuyahoga Community College* (1998), 129 Ohio App.3d 461, 465, 717 N.E.2d 1189. This court declines to recognize such an action without the Supreme Court or the General Assembly doing so first, as have others. See *Strausbaugh v. Ohio Dept. of Transp.*, 150 Ohio App.3d 438, 2002-Ohio-6627, 782 N.E.2d 92; see, also, *Bell v. Cuyahoga Community College* (1998), 129 Ohio App.3d 461, 717 N.E.2d 1189.

{¶ 35} Scarabino tries to escape summary judgment on these grounds by arguing that she was constructively discharged. However, Scarabino did not place the hospital on notice of that claim by raising it in her complaint, so it was given no chance to respond to it. Regardless, even if Scarabino had alleged wrongful discharge in violation of public policy, she still loses based upon her union membership. Accordingly, the trial court properly granted summary judgment on Scarabino's second claim. Because summary judgment was proper on both claims, her first assignment of error is meritless.

{¶ 36} As her second assignment of error, Scarabino alleges:

{¶ 37} "The judgment of the trial court should be reversed based upon the trial court's erroneous reliance of appellees [sic] assertion that Ohio does not have its own 'whistleblowers' protection act, when it indeed does and has since 1990, known as Ohio Revised Code Section 4113.52, and that the facts contained herein clearly create a justiciable issue the citizens of this district should decide, as opposed to summary disposal of a case that involves a serious health and safety matter existing at East Liverpool Hospital, and the trial court committed reversible error when denying appellant's motion for a new trial and/or its motion to vacate judgment pursuant to Rule 60(B)."

{¶ 38} Appellee's brief sums up the problem with this assignment of error when it says that "these statements make no sense. Scarabino never filed any motion for a new trial or motion to vacate judgment." There is no indication in the docket that anything was filed by Scarabino after the notice of appeal. In addition, it appears that no mention of the "Whistleblower Statute" was made by either the parties or the trial court during the course of litigation, since Scarabino failed to raise such a claim in her complaint. Therefore, Scarabino's second assignment of error is also meritless.

{¶ 39} Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

WAITE, P.J., and VUKOVICH, J., concur.