**CHANDLER AND ASSOCIATES, INC. et al. Appellants,**

v.

**AMERICA'S HEALTHCARE ALLIANCE, INC. et al., Appellees.**

[Cite as *Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.* (1997), 125 Ohio App.3d 572.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 71325 and 71832.

Decided Dec. 11, 1997.

*Weston, Hurd, Fallon, Paisley & Howley, L.L.P.,* and *William H. Baughman, Jr.; Conway, Marken, Wyner, Kurant & Kern* and *Peter Turner,* for appellants.

*Robert P. DeMarco,* for appellees.

Rocco, Judge.

Chandler and Associates, Inc. ("C & A") and Primary Health Services, Inc. ("PHS") appeal from two judgments of the common pleas court. On August 27, 1996, the court, pursuant to jury verdict, found in favor of Daniel J. Stypula on his counterclaims for breach of contract and tortious interference with business relationships, and awarded him compensatory and punitive damages. On December 18, 1996, the court awarded him prejudgment interest on those damages. We affirm the judgments as modified.

C & A provides administrative services to businesses with self-funded employee medical insurance plans. PHS is a managed care provider, *i.e.,* a "PPO," which contracts with medical providers, such as hospitals, physicians, and radiologists, for the provision of medical services. C & A and PHS are owned by Arthur W. Chandler.

In May, 1990, Chandler hired Stypula as the Director of Large Group Marketing for C & A and as an independent broker for PHS. At the time of hire, Stypula was the sole proprietor of his own business, Benefit Concept Consultants,

which Chandler permitted him to continue operating. Chandler agreed to pay Stypula a base salary, plus commissions, on the fees paid to C & A and PHS by business clients Stypula procured. Chandler further promised to pay such commissions to Stypula, so long as his clients remained "on the books." C & A paid these commissions directly to Stypula, while PHS paid the commissions to Benefit Concept Consultants.

During the subsequent three years, Stypula procured a number of clients for C & A and/or PHS, many of which considered him their broker, and earned a substantial annual gross income from commissions. In 1992, Chandler discharged Stypula from his director position with C & A. However, Chandler retained him as an independent broker for both C & A and PHS, and permitted Stypula to maintain an office on their premises. Although Stypula was an independent broker and no longer an employee of C & A, C & A and PHS continued to pay the same commissions to him and Benefit Concept Consultants.

On July 26, 1993, Stypula and others formed their own PPO, America's Healthcare Alliance, Inc., under the tradename of America's Workers' Compensation Alliance ("AWCA"). Although a PPO, AWCA executed no access contracts with medical providers for provision of health care services, since Stypula and others formed AWCA merely as a means of sharing commissions and protecting their personal assets. Thereafter, Stypula, acting in his capacity as an independent broker for C & A and PHS, while actually doing business as AWCA, continued to market the services of C & A and PHS. However, Stypula did not tell Chandler that he had formed AWCA.

On August 13, 1993, Stypula sent a marketing letter to Compensation Consultants, Inc. ("CCI"), in which ne claimed that AWCA had access to numerous medical providers. Following this, he arranged a meeting with representatives from CCI, Richard Alkire and Ted Miller, having obtained the prior approval of PHS's President, William Daley, Jr. On August 27, 1993, Stypula met personally with CCI representatives. At this meeting, he marketed PHS's services and, with the approval of Daley, gave the CCI representatives a copy of PHS's medical provider booklet.

Shortly thereafter, Chandler learned that Stypula had formed AWCA and had participated in the meeting with CCI representatives. Chandler then concluded that Stypula had engaged in deceptive trade practices and was unfairly competing with C & A and PHS. On October 7, 1993, C & A and PHS commenced the instant case. On October 21, 1993, Chandler wrote letters to Stypula's clients, notifying them that Stypula was "no longer a broker authorized to place business with Chandler & Associates, Inc., Primary Health Services, Inc., or any of our affiliates."

On October 29, 1993, Chandler wrote a letter to Stypula, in which Chandler terminated Stypula's authority to act as C & A's and PHS's broker, and ceased the payment of commissions to him, both effective as of the date AWCA was incorporated. Subsequently, Chandler informed Stypula's clients that neither C & A nor PHS would conduct any direct business with Stypula or pay him any further commissions. In addition, C & A and PHS obtained an injunction against Stypula, enjoining him from representing himself and AWCA as affiliates of C & A and PHS, and sent copies of this injunction to his clients. As a result of Chandler's October 1993 actions, some of Stypula's clients were eventually forced to cease doing business with him in order to maintain their contracts with C & A and PHS. However, CCI subsequently entered into a contract for PHS's services.

In their complaint, C & A and PHS alleged unfair competition, misappropriation of trade secrets, deceptive trade practices, breach of fiduciary duty, and tortious interference with contractual relationships, for which they sought compensatory and punitive damages. Stypula counterclaimed, alleging breach of contract to pay him commissions, as long as his clients remained on C & A's and PHS's books, deceptive trade practices, and tortious interference with business relationships.

Upon cross-motions for summary judgment, the court granted partial summary judgment to Stypula, dismissing C & A's and PHS's entire complaint against Stypula, and the case proceeded to trial on Stypula's contract and tort counterclaims. C & A and PHS moved for a directed verdict on these claims, which the court denied. At the close of all the evidence, the case was submitted to a jury, which found in favor of Stypula.

The court awarded Stypula compensatory and punitive damages, totaling $1,350,000 plus costs against PHS and $450,000 plus costs against C & A, based upon the testimony of an expert witness, an economist, Dr. John F. Burke, Jr. Four months later, the court awarded Stypula prejudgment interest of $97,273.12 against PHS and $32,424.37 against C & A.

C & A and PHS now appeal raising fourteen assignments of error for our review. We shall consider related assignments together and review them in an order that promotes clarity and continuity.

## I

The twelfth assignment of error challenges the court's summary judgment grant to Stypula on PHS's claim of deceptive trade practices, and states:

"The trial court committed prejudicial error in granting summary judgment for defendant Daniel Stypula on plaintiff Primary Health Services, Inc.'s Ohio Deceptive Trade Practices Act Claim because genuine issues of material fact

existed as to whether Daniel Stypula's representations to Compensation Consultants, Inc. caused a likelihood of confusion or misunderstanding regarding the affiliation of American Workers' Compensation Alliance, Inc. with Primary Health Services, Inc."

Civ.R. 56(C) states in part:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

In their summary judgment motion, C & A and PHS contended that Stypula, by sending the August 13, 1993 letter to CCI and, subsequently, meeting with its representatives, "passed off" the services of PHS as those of AWCA and, in so doing, likely caused confusion regarding the lack of affiliation between the two PPO's. Although C & A and PHS admitted that they incurred no monetary damages due to Stypula's actions, they argued that such passing off constituted a deceptive trade practice, entitling them to an award of attorney fees.

In his own summary judgment motion, Stypula urged that he did not engage in deceptive trade practices. He contended that he represented himself to CCI as not only the owner of his own business, AWCA, but also as the broker for C & A and PHS. He further urged that he marketed to CCI the services of only PHS, that he obtained CCI as his own client, and that CCI, as a result of his marketing, later contracted with PHS.

The Ohio Deceptive Trade Practices Act, R.C. Chapter 4165, controls the resolution of this issue and provides in part:

"A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

"(A) Passes off goods or services as those of another;

"* * *

"(C) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another[.]" R.C. 4165.02.

"The court may award reasonable attorneys' fees to the prevailing party. * * * Costs for attorneys' fees may be assessed against a defendant if the court

finds that the defendant has willfully engaged in the trade practice knowing it to be deceptive." R.C. 4165.03.

■ When adjudicating claims arising under the Ohio Deceptive Trade Practices Act, Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law. *Cesare v. Work* (1987), 36 Ohio App.3d 26, 520 N.E.2d 586; *Cincinnati Sub–Zero Products, Inc. v. Augustine Med., Inc.* (S.D.Ohio 1992), 800 F.Supp. 1549; *Worthington Foods, Inc. v. Kellogg Co.* (S.D.Ohio 1990), 732 F.Supp. 1417.

■ In *Worthington Foods, supra,* at 1431, the court defined "palming off," which is analogous to "passing off," as used in the Ohio Deceptive Trade Practices Act:

"Palming off occurs when a defendant attempts to bring about consumer confusion by causing consumers to purchase *its products* under the *mistaken belief* that they are in fact purchasing *the plaintiff's goods.*" (Emphasis added.)

■ In our case, the evidence attached to both summary judgment motions revealed that (1) prior to his October 29, 1993 termination, Stypula was without question an authorized broker for C & A and PHS, with authority to access its medical providers for his clients; (2) Stypula was also an independent broker, operating his own business with Chandler's permission, of which he himself was an affiliate; in fact, PHS paid Stypula's commissions to his business, Benefit Concept Consultants; (3) rather than compete with C & A or PHS, Stypula continued his marketing efforts to procure clients for them, assuming that, as their authorized broker, they would continue to pay him commissions; (4) the August 13, 1993 letter to CCI claimed: "AWCA and its affiliates [have] access to 124 hospitals and over 6,500 physicians in Ohio and over 4,000 hospitals and 100,000 physicians nationally"; (5) at the August 27, 1993 meeting between Stypula and CCI representatives, he gave them a copy of PHS's medical provider booklet, having obtained prior permission from PHS's President to attend the meeting and provide the booklet; (6) both CCI representatives stated they understood, following their meeting with Stypula, that he was marketing the PPO services of only PHS; (7) on April 22, 1994, PHS and CCI executed a PPO Agreement; and (8) at no time, up to and including the duration of this litigation, did Stypula attempt to transfer, or actually transfer, any of his clients from C & A and/or PHS, even though there was no noncompetition agreement between Stypula, C & A, and PHS.

Construing this evidence most strongly in favor of C & A and PHS, reasonable minds can come to but one conclusion, *to wit,* in August 1993, Stypula, an authorized broker for C & A and PHS, marketed to CCI the services offered only by PHS, after which CCI contracted with only PHS for such services. Although

Stypula conducted his marketing campaign while doing business as AWCA, CCI representatives understood that they were contracting with PHS for PHS's services.

Thus, Stypula did not cause CCI to purchase PPO services under any *mistaken belief* regarding the provider of such services and, as a matter of law, did not pass off or palm off his own services. Furthermore, Stypula did not cause a likelihood of confusion regarding the lack of affiliation between AWCA and PHS. As an independent broker for PHS, Stypula, who was an affiliate of AWCA, did indeed have access to PHS's medical providers.

Stypula, therefore, was entitled to judgment as a matter of law on C & A's and PHS's deceptive trade practices claim, and the trial court did not err when it granted him summary judgment. Accordingly, this assignment of error is overruled.

## II

The first, second, third, and fourth assignments of error challenge the trial court's denial of C & A's and PHS's motion for directed verdict on Stypula's claims of breach of contract to pay him commissions and tortious interference with business relationships.

Civ.R. 50(A)(4) provides that the trial court shall direct a verdict for the moving party, after construing the evidence most strongly in favor of the nonmoving party, if it finds that, upon any determinative issue, reasonable minds could come to but one conclusion, upon the evidence submitted, and that conclusion is adverse to the nonmoving party. A motion for directed verdict raises a question of law, since it tests the legal sufficiency of the evidence. *Clark v. Southview Hosp. & Family Health Ctr.* (1994), 68 Ohio St.3d 435, 628 N.E.2d 46; *Keeton v. Telemedia Co. of S. Ohio* (1994), 98 Ohio App.3d 405, 648 N.E.2d 856.

## A

The first assignment of error states:

"The trial court committed prejudicial error by denying plaintiffs' motion for directed verdict on defendant Daniel Stypula's breach of contract claim because Daniel Stypula submitted no evidence of a contract to pay commissions for contracts entered into after the termination of Daniel Stypula's brokerage relationship with the plaintiffs."

C & A and PHS claim that the trial court erred when it denied their motion for directed verdict on Stypula's breach of contract claim. Relying upon

this court's decision in *Frappier v. Excello Specialty Co.* (June 2, 1994), Cuyahoga App. No. 65605, unreported, 1994 WL 245757, they argue that Stypula presented no evidence in support of his claim that they entered into a contract to pay him commissions, so long as his clients remained on the books.

In *Frappier, supra,* we held that the trial court erred when it failed to direct a verdict for Excello Specialty on Frappier's breach of contract claim, finding that Frappier adduced no evidence that the parties entered into a contract for the payment of post-termination commissions. In the case before us, however, the record does contain evidence that C & A and PHS entered into a contract to pay Stypula commissions, as long as his clients remained on the books, and, hence, *Frappier, supra,* is inapposite.

We first observe that the transcript is replete with testimony, including that of PHS's President Daley, that Chandler himself expressly promised to pay Stypula commissions, as long as Stypula's clients remained on the books. In addition, C & A and PHS continued to pay commissions to Stypula and Benefit Concept Consultants after Stypula was terminated as a director of C & A but retained as an independent broker.

However, C & A and PHS, in reliance upon *Krueger v. Schoenling Brewing Co.* (1948), 82 Ohio App. 57, 37 O.O. 375, 79 N.E.2d 366, further argue that no meeting of the minds occurred to form a contract to pay Stypula post-termination commissions.

In *Krueger, supra,* Krueger alleged that a brewery agreed to pay him commissions, as long as the brewery sold beer to the customers he procured. He further argued that this agreement obligated the brewery to pay him such commissions following his termination from employment. However, the court disagreed, stating that no meeting of the minds occurred, since the payment of lifetime commissions was not considered by either party when the contract was formed.

In our case, neither C & A nor PHS asserted the issue of "mutual assent" at trial. It is well settled in Ohio that a reviewing court will not consider issues which the appellant failed to raise in the trial court. See *Cleveland v. Assn. of Cleveland Fire Fighters, Local 93, Internatl. Assn. of Fire Fighters* (1991), 73 Ohio App.3d 220, 596 N.E.2d 1086; *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629.

Regardless, we find significant the following colloquy between Stypula's counsel and Chandler:

"Q. As a matter of fact, *you were perfectly willing to pay commissions the entire time you had the business on the books,* up until the time you stopped; isn't that true, Mr. Chandler?

"A. *Yes, it is.*

"Q. And the reason you stopped * * * it is because you didn't sign a new brokerage agreement, number one, and number two, he lost favor with you?

"A. That's correct. He lost standing with the company." (Emphasis added.)

Based upon the foregoing evidence, reasonable minds could conclude that Chandler and Stypula, with mutual assent, entered into an express oral contract, which obligated C & A and/or PHS to pay Stypula commissions so long as his clients remained on the books. Accordingly, this assignment of error is overruled.

## B

The second, third, and fourth assignments of error argue that the court erred when it denied C & A's and/or PHS's motion for directed verdict, on Stypula's tortious interference with business relationships claim.

"The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.

"* * * The basic principle of a 'tortious interference' action is that one, who without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby." *Wolf v. McCullough–Hyde Mem. Hosp.* (1990), 67 Ohio App.3d 349, 355, 586 N.E.2d 1204, 1208–1209. See *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235; *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219; *Smith v. Ameriflora 1992, Inc.* (1994), 96 Ohio App.3d 179, 644 N.E.2d 1038; *Hoyt, Inc. v. Gordon & Assoc., Inc.* (1995), 104 Ohio App.3d 598, 662 N.E.2d 1088.

However, the doctrine of qualified privilege is applicable to tortious interference cases, and acts performed within a business relationship are considered subject to a qualified privilege. *Smith, supra; Juhasz, supra; Elwert, supra.* In order to overcome a defense of qualified privilege, a party must show that the wrongdoer acted with actual malice. Actual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship. *Smith, supra; Hoyt, supra.*

The third assignment of error states:

"The trial court committed prejudicial error by denying plaintiff Chandler & Associates, Inc.'s motion for directed verdict on defendant Daniel Stypula's

tortious interference with business relations claim because Daniel Stypula did not submit evidence that any interference on the part of that plaintiff was improper."

C & A and PHS, in reliance upon *Hoyt, supra,* contend that the court erred when it denied their motion for directed verdict, claiming that Stypula adduced no evidence that C & A's interference actually constituted improper conduct.

*Hoyt, supra,* however, applied the law of tortious interference with a contractual relationship which, although similar in form, is distinguishable from the substantive law of tortious interference with a business relationship. Accord *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 552 N.E.2d 207; *Smith v. Klein* (1985), 23 Ohio App.3d 146, 23 OBR 387, 492 N.E.2d 852. Stypula commenced a cause of action for interference with business relationships and not for interference with contractual relationships.

Applying the apposite law, C & A essentially asserts a qualified privilege to interfere with Stypula's business relationships. As noted above, C & A did, in fact, have business relationships with all of Stypula's clients, since these clients had executed contracts with either C & A and/or PHS. Therefore, C & A's actions regarding Stypula's clients were subject to a qualified privilege, unless they were performed with actual malice.

The evidence adduced at trial revealed that (1) Chandler sent a letter to Stypula's clients informing them that Stypula was "[n]o longer a broker authorized to place business with Chandler & Associates, Inc., and Primary Health Services, Inc., or any of our affiliates"; (2) Chandler sent copies of the injunction against Stypula to Stypula's clients; (3) Chandler informed Stypula's clients that Stypula would not be permitted to service their accounts and that C & A would appoint new brokers for this purpose; (4) Chandler refused to deal with Stypula, even though some of his clients protested and expressed their desires to retain Stypula as their broker; (5) a few months prior to the renewal deadlines for Stypula's clients' contracts, representatives of C & A contacted the clients directly, refused to negotiate the terms of renewal with Stypula, and further refused to provide Stypula with records he needed to accurately advise his clients regarding renewal; (6) meanwhile, some of Stypula's clients did not have sufficient time to seek services from other providers, so they were compelled to renew their contracts with C & A and/or PHS at rates which were often more costly than those arranged by Stypula; (7) Tri–County, one of Stypula's clients, wrote a letter to C & A, which stated in part: "[I]t appears that Chandler is doing business at 'the point of a gun' and this appears to be an unfair business practice to us. * * * It appears that your company is so angry with Mr. Stypula that it is perfectly willing to lose our account, rather than you having to deal with Mr.

Stypula in any capacity"; and (8) while Tri–County and other clients renewed their contracts with C & A, some refused to renew the following year.

Based upon this evidence, reasonable minds could conclude that Chandler's interference with Stypula's business relationships was unjustified and/or improper and, thus, done with actual malice. The evidence, construed most strongly in Stypula's favor, suggests that Chandler was so determined to destroy Stypula's business relationships that he willingly risked losing, and later did lose, clients in the process, and possibly forced these clients to pay higher rates for insurance. Accordingly, this assignment of error is overruled.

The second assignment of error states:

"The trial court committed prejudicial error by denying plaintiff Primary Health Services, Inc.'s motion for directed verdict on defendant Daniel Stypula's tortious interference with business relations claim because Daniel Stypula did not submit any evidence of interference by that plaintiff with any business relationship of that defendant."

C & A and PHS argue that Stypula adduced no evidence that PHS, in and of itself, interfered with any of his business relationships.

However, as we previously have observed, Chandler, the owner of *both C & A and PHS,* informed Stypula's clients of his termination *from C & A and PHS,* and that Stypula was no longer authorized to act as a broker for *either C & A or PHS.* Based upon this evidence, reasonable minds could conclude that Chandler acted on behalf of not only C & A, but also PHS, inasmuch as he owned both companies, and that each company was liable for injury that Chandler caused to Stypula. Accordingly, this assignment of error is overruled.

The fourth assignment of error states:

"Alternatively, the trial court committed prejudicial error by denying plaintiff Chandler & Associates, Inc.'s motion for directed verdict on defendant Daniel Stypula's tortious interference with business relations claim with respect to Tri–County because Daniel Stypula did not submit evidence that interference by that plaintiff caused Tri–County to discontinue its brokerage relationship with him."

C & A and PHS contend that the trial court erred when it denied their motion for directed verdict because Stypula adduced no evidence that C & A's interference caused Tri–County, one of Stypula's clients, to discontinue its business relationship with Stypula. C & A and PHS further argue that the evidence revealed that Tri–County did not, in fact, discontinue its brokerage relationship with Stypula.

Ironically, Tri–County is the client that accused C & A and PHS of "doing business at the point of a gun." Tri–County did reluctantly renew its

contract with C & A and paid Stypula his commission, since C & A refused to do so. Regardless, even if Chandler's actions did not result in the termination of Stypula's business relationship with Tri–County, the denial of C & A's and PHS's directed verdict was proper.

The trial court, for purposes of determining the motion for directed verdict, did not, and was not required to, separately consider whether C & A and/or PHS tortiously interfered with each and every one of Stypula's clients and concomitantly deny or grant a separate directed verdict with respect to each and every client. C & A and PHS moved for a single directed verdict on Stypula's entire claim of tortious interference with business relationships, not for a directed verdict with respect to each particular client.

The evidence revealed that, following Chandler's interference, a number of Stypula's clients, including Motch, renewed their contracts with C & A and/or PHS. Significantly, Motch, Tri–County, and perhaps others felt compelled to renew on Chandler's terms, which included their relinquishment of Stypula as broker, due to the close proximity of the contract renewal deadlines. Thus, by renewing their contracts according to Chandler's terms, Stypula's clients, as a proximate result of Chandler's interference, terminated their business relationships with him.

Furthermore, although his clients remained on C & A's and PHS's books, Stypula was denied commissions on their contract fees. In 1993, Stypula realized an annual gross income from commissions on his clients' accounts of nearly $180,000. In 1994, the year following his termination from C & A and PHS and the cessation of his commission payments, he realized an annual gross income of only $24,000.

Based upon this evidence, reasonable minds could conclude that Chandler, acting on behalf of C & A and/or PHS, intentionally interfered with one or more of Stypula's business relationships and proximately caused a breach or termination of one or more of these relationships, which resulted in substantial damages to Stypula. Thus, the trial court correctly denied the motion for directed verdict. Accordingly, this assignment of error is overruled.

### III

The ninth, eleventh, and thirteenth assignments of error challenge the trial court's evidentiary rulings.

Evid.R. 103(A)(1) states:

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and * * * timely objection or motion to strike appears of record * * *."

A trial court's ruling that certain evidence will be admitted shall not constitute grounds for reversal absent a showing of clear and prejudicial abuse of discretion. An abuse of discretion signifies more than an error of law but, rather, implies that the court's attitude was unreasonable, unconscionable or arbitrary. *McAllister v. Consol. Rail Corp.* (1995), 108 Ohio App.3d 212, 670 N.E.2d 514.

The ninth assignment of error states:

"The trial court committed prejudicial error in admitting the opinion testimony of Dr. Burke, over plaintiffs' objection, because he based that opinion on documents not in evidence that he did not prepare contrary to Evid.R. 703."

C & A and PHS contend the trial court erred when it permitted, over objection, the testimony of Stypula's expert witness, an economist, Dr. John F. Burke, Jr. C & A and PHS argue that, because Burke's calculation of damages was based, in part, upon Stypula's previous income tax returns, which Burke did not prepare and which were not introduced into evidence, the admission of his testimony violated Evid.R. 703.

Evid.R. 703 states in part:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence * * *."

In *State v. Solomon* (1991), 59 Ohio St.3d 124, 126, 570 N.E.2d 1118, 1120, the Supreme Court addressed this issue, stating in part:

"[W]here an expert bases his opinion, *in whole or in major part*, on facts or *data perceived by him*, the requirement of Evid.R. 703 has been satisfied." (Emphasis added.) See *State v. Underwood* (1991), 73 Ohio App.3d 834, 598 N.E.2d 822; *Lambert v. Goodyear Tire & Rubber Co.* (1992), 79 Ohio App.3d 15, 606 N.E.2d 983; *Worthington City Schools v. ABCO Insulation* (1992), 84 Ohio App.3d 144, 616 N.E.2d 550.

In our case, the evidence reveals that Burke did, in fact, "perceive" Stypula's tax returns, primarily the Schedule C returns. Furthermore, Burke testified that he based his calculation of Stypula's damages not upon the data contained in the tax returns, but, rather, upon his review of commission statements for each of Stypula's clients, stop-loss reports, savings reports, and pre-savings reports, all provided to him by C & A and/or PHS. According to Burke, the only data he used from the tax returns came from Schedule C and were used to reduce, rather than increase, the calculation of Stypula's damages.

Since Burke perceived the tax returns and did not base his opinion, *in whole or in major part*, on the data contained in the tax returns, the trial court's admission of Burke's testimony did not constitute a clear and prejudicial abuse of discretion. Accordingly, this assignment of error is overruled.

The eleventh assignment of error states:

"The trial court committed prejudicial error in admitting into evidence, over plaintiffs' objection, Commission Schedules For Competitors Emerald Health Network and Health Star because such documents contain irrelevant hearsay."

At trial, Stypula testified as to the amounts he would have earned as commission for procuring the CCI account, had he been employed by Emerald Health Network and Healthstar Managed Care Corp., rather than C & A and PHS. In so testifying, he read from commission schedules of these providers and neither C & A nor PHS objected. However, at the close of both cases-in-chief, C & A and PHS objected to admission of the commission schedules into evidence, arguing only that these were irrelevant.

Since C & A and PHS failed to object to Stypula's testimony regarding the commissions he would have earned as a broker for Emerald Health Network and Healthstar Managed Care Corp., we cannot say that the trial court's admission of the commission schedules, upon which his testimony was based, affected one of their substantial rights. Hence, C & A and PHS may not predicate error upon this evidentiary ruling, and the trial court's admission of the commission schedules did not constitute a clear and prejudicial abuse of discretion. Accordingly, this assignment of error is overruled.

The thirteenth assignment of error states:

"The trial court committed prejudicial error in permitting Stypula to testify at trial, over plaintiffs' objection, that the judge 'threw out' plaintiffs' case because it was 'not a good suit.'"

At trial, the following colloquy occurred between Stypula and his counsel:

"Q. Mr. Stypula, you mentioned that on October 29, 1993, you obtained this letter from PHS, as well as the one from Chandler & Associates, terminating your authority to act as a broker?

"A. Yes.

"Q. Prior to that, had there been a lawsuit filed in this matter by Mr. Chandler against you?

"* * *

"A. Yes, there was.

"Q. And what was the disposition of that lawsuit?

"A. The court decided it was not a good suit; they [sic] threw it out—[.]"

Counsel for C & A and PHS then objected, but the court overruled the objection. However, C & A and PHS failed to cite any legal authority, in their appellate brief, which supports this assignment of error.

App.R. 12(A)(2) provides us with the authority to "[d]isregard an assignment of error presented for review if the party raising it * * * fails to argue the assignment separately in the brief, as required under App.R. 16(A)." See *Taylor v. Franklin Blvd. Nursing Home, Inc.* (1996), 112 Ohio App.3d 27, 677 N.E.2d 1212; *N. Coast Cookies, Inc. v. Sweet Temptations, Inc.* (1984), 16 Ohio App.3d 342, 16 OBR 391, 476 N.E.2d 388; *Foster v. Cuyahoga Cty. Bd. of Elections* (1977), 53 Ohio App.2d 213, 7 O.O.3d 282, 373 N.E.2d 1274.

App.R. 16(A)(7) requires the appellant to "[i]nclude in its brief * * * an argument containing the contentions of the appellant *with respect to each assignment of error presented for review* and the reasons in support of the contentions, *with citations to the authorities, statutes,* and parts of the record on which appellant relies * * *." (Emphasis added.)

Since C & A and PHS failed to comply with the foregoing Appellate Rules and applicable case law, we decline to review this assignment of error.

## IV

The fifth, sixth, seventh, eighth, tenth, and fourteenth assignments of error implicate the damages and interest awarded to Stypula.

## A

The fifth assignment of error states:

"The trial court committed prejudicial error by submitting Daniel Stypula's claim for punitive damages against plaintiff Primary Health Services, Inc. to the jury because Daniel Stypula did not submit any evidence of liability against that plaintiff on the underlying tortious interference claim."

C & A and PHS contend that Stypula did not adduce evidence that PHS, in and of itself, tortiously interfered with his business relationships. However, we addressed this issue in our review of the second assignment of error, *supra.* Accordingly, this assignment of error is overruled.

The sixth assignment of error states:

"The trial court committed prejudicial error by submitting Daniel Stypula's claim for punitive damages against plaintiff Chandler & Associates, Inc. to the jury because Daniel Stypula did not submit any evidence of liability against that plaintiff on the underlying tortious interference claim."

C & A and PHS contend that Stypula did not adduce evidence that C & A tortiously interfered with his business relationships. However, we addressed this issue in our review of the third and fourth assignments of error, *supra.* Accordingly, this assignment of error is overruled.

The seventh assignment of error states:

"The trial court committed prejudicial error by submitting Daniel Stypula's claim for punitive damages against plaintiff Chandler & Associates, Inc. with respect to [Stypula's client] Motch to the jury because Daniel Stypula did not establish a prima facie case of actual malice regarding that plaintiff's conduct."

C & A and PHS contend that Stypula did not establish a *prima facie* case of "actual malice" regarding C & A's conduct with Stypula's client Motch. However, in our review of the third assignment of error, *supra*, we addressed the matter of actual malice. Accordingly, this assignment of error is overruled.

B

The eighth, tenth, and fourteenth assignments of error all challenge the amount of monetary damages plus interest awarded to Stypula and shall be considered together. These respectively state:

"The trial court committed reversible error in instructing the jury on damages for both breach of contract and tortious interference and in submitting interrogatories for damages as to both claims because such instructions and interrogatories resulted in the jury's award of double recovery to plaintiff."

"The total amount of compensatory damages awarded by the jury is against the manifest weight of the evidence."

"The trial court committed prejudicial error in awarding defendant Daniel Stypula prejudgment interest on the tortious interference claim."

C & A and PHS first argue that the compensatory damages award constitutes a double recovery and is against the manifest weight of the evidence. A reviewing court may not reverse a judgment in a civil case as being against the manifest weight of the evidence if that judgment is supported by some competent, credible evidence going to all the essential elements of the case. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

The record reveals that the jury awarded damages totaling $1,800,000, *i.e.*, $1,350,000 in compensatory damages and $450,000 in punitive damages. The record also reveals that Stypula's expert witness, the economist Dr. Burke, calculated Stypula's economic loss at $1,237,000, of which $490,000 represented the loss of commissions from October 1993 through September 1996, and $747,000 reflected the diminished value of his business. Thus, the court awarded Stypula $1,350,000 in compensatory damages, but the evidence showed that he incurred compensatory damages of only $1,237,000.

■ The award, therefore, is not supported by competent, credible evidence and is against the manifest weight of the evidence. However, this court has the authority to order a remittitur when indicated. *McCoy v. McCoy* (1993), 91 Ohio App.3d 570, 632 N.E.2d 1358; *Knor v. Parking Co. of Am.* (1991), 73 Ohio App.3d 177, 596 N.E.2d 1059.

Accordingly, we order a remittitur of $113,000 in compensatory damages, reducing those damages to $1,237,000. Adding this amount to the jury's $450,000 punitive damages award, we enter judgment in favor of Stypula for $1,687,000. We further apportion this amount between C & A and PHS, using the same percentages as did the jury, *i.e.,* C & A is liable for one-fourth of the total amount, $421,750, while PHS is liable for three-fourths of the total amount, $1,265,250.

Since the compensatory damages award equals Stypula's economic loss as calculated by Dr. Burke, it does not constitute a "double recovery." Accordingly, the eighth assignment of error is overruled, and the tenth assignment of error is sustained.

C & A and PHS further argue that the trial court erred when it awarded pre-judgment interest to Stypula on his tortious interference claim. Specifically, they assert that the judgment in favor of Stypula on his tortious interference claim "was erroneously entered" and, therefore, neither damages nor interest should be awarded on that claim.

However, we have already observed that competent, credible evidence was adduced at trial in support of Stypula's tortious interference claim. Stypula, therefore, is entitled to damages and interest on that claim. Accordingly, the fourteenth assignment of error is overruled.

Nonetheless, since the compensatory damages award was against the manifest weight of the evidence, we vacate the December 18, 1996 prejudgment interest award and recalculate the amount of interest owing. Prejudgment interest shall be computed "[f]rom the date the cause of action accrued" at a rate of ten percent per year. R.C. 1343.03(A) and (C). Stypula's causes of action for tortious interference and breach of contract both arose in October 1993, when Chandler sent letters to his clients and terminated Stypula from C & A and PHS.

Since we review this case in October 1997, we calculate prejudgment interest at a rate of ten percent per year for four entire years. Interest at ten percent on $112,500, reduced by 8.37 percent, for four years amounts to $144,317.15; thus, this is the amount on the tort claim for which C&A is liable. Interest at ten percent on $337,500, reduced by 8.37 percent, for four years amounts to $432,-951.75; thus, this is the amount on the tort claim for which PHS is liable.

Adding the appropriate amounts together, the judgment against C&A is in the total amount of $462,973.40 and the judgment against PHS is in the total amount of $1,388,950.50.

The trial court's judgment is affirmed as modified in this opinion.

*Judgment affirmed*
*as modified.*

PATRICIA ANN BLACKMON, P.J., and ANN DYKE, J., concur.