**SANCAP ABRASIVES CORP., Plaintiff,**

v.

**SWISS INDUSTRIAL ABRASIVES GROUP, et al., Defendants.**

**No. 98–CV–2391.**

United States District Court, N.D. Ohio, Eastern Division.

Sept. 28, 1999.

855

Peter Robert Harwood, Richard M. Bain, Buckley, King & Bluso, Cleveland, OH, Duard D. Bradshaw, Buckley, King & Bluso, Akron, OH, for Plaintiff.

Anthony J. O'Malley, Marcel C. Duhamel, Vorys, Sater, Seymour & Pease, Cleveland, OH, Daniel G. Clodfelter, Gregory J. Murphy, Karin M. McGinnis, Moore & VanAllen, Charlotte, NC, Timothy F. Sweeney, Law Offices of Timothy Farrell Sweeney, Cleveland, OH, Philip G. Gardner, Gardner, Gardner, Barrow & Sharpe, Martinsville, VA, for Defendants.

## OPINION AND ORDER

GWIN, District Judge.

In this Opinion and Order, the Court reviews and rules on the summary judgment motions filed by each defendant in this action, specifically (1) Defendant SIA Schweizer Schmirgel und Schleifindustrie AG ("SIA") [Doc. 60]; (2) Defendant Swiss Abrasives Marketing ("SAM") [Doc. 62]; and (3) Defendants C & S Agency, James Connelly, Connelly Inc., Edward Sikes, Sikes Inc. (referred to collectively as the "C & S Defendants") [Doc. 66]. With these motions, the defendants assert that no material factual dispute exists with regard to the claims asserted by Plaintiff Sancap Abrasives Corporation ("Sancap").

In this action, Plaintiff Sancap makes claim principally under the Sherman Act. First, Sancap alleges that the defendants conspired to eliminate Sancap as a manufacturer and distributor of abrasives products, in violation of § 1 of the Sherman Act. Second, Sancap alleges that Defendants SIA and SAM attempted to monopolize the sale of abrasives products in the southeastern portion of the United States, in violation of § 2 of the Sherman Act.

Beyond the Sherman Act, Sancap brings state law claims for promissory estoppel, implied contract, and tortious interference with business relationships against Defendants SIA and SAM. Sancap also asserts state law claims for theft of trade secrets and tortious interference with business relationships against the C & S Defendants.

Upon reviewing the defendants' motions, the Court grants summary judgment to each defendant on each of the plaintiff's claims.

## I. Background

Plaintiff Sancap, located in Ohio, engaged in the manufacture and distribution of abrasives products throughout the United States. Defendant SIA, located in Switzerland, is among the world's largest manufacturers of abrasives products. Defendant SAM, located in North Carolina, imports and sells SIA-brand products. The C & S Defendants, located in Virginia, serve as independent sales agents for abrasives product distributors.

The relationship between Sancap and SIA began in 1992, when Sancap's predecessor, Sancap Abrasives Incorporated ("Old Sancap"), contracted to serve as the exclusive distributor of SIA-brand products in the United States. At that point, Old Sancap's operations included (1) the manufacture and distribution of its own brand of abrasives products, (2) the conversion of SIA raw materials (known as "jumbo rolls") into finished SIA-brand abrasives products, and (3) the distribution of SIA-brand finished products, both those converted by Old Sancap and those purchased directly from SIA.

After becoming SIA's exclusive distributor, Old Sancap hired James Connelly and Ed Sikes, two sales agents, who, along with their personal business entities, comprise the C & S Defendants. Old Sancap distributed the bulk of its SIA-brand products through the C & S Defendants.

In September 1996, SIA notified Old Sancap of its decision to terminate their exclusive distributorship agreement, effective January 31, 1997. Though it could still purchase SIA raw materials and SIA-brand products for resale after that date, Old Sancap (1) would make such purchases through SAM, an affiliate of SIA, and (2) would share in the distribution of SIA-brand products with other distributors.

In early 1997, the C & S Defendants learned of SIA's decision to terminate its

distributorship agreement with Sancap. Shortly thereafter, the C & S Defendants initiated a meeting with Klaus Hoeche ("Hoeche"), the president of SAM. The parties dispute the nature of this meeting. The C & S Defendants insist that they simply wanted to discover the status of the SIA product line. The plaintiff, in contrast, claims that this meeting marks the beginning of the defendants' conspiracy to eventually eliminate Sancap from the abrasives industry.

After the termination of the exclusive distributorship agreement at the end of 1997, Old Sancap continued to convert and distribute SIA-brand products. At about this time, a group of investors began making inquiries with regard to the possible purchase of Old Sancap. Because SIA-brand products represented a significant portion of Old Sancap's gross sales, the relationship between Old Sancap and SAM was of particular importance to these investors.

Thus, Edward Spinelli ("Spinelli"), the leader of the investment group, met with Hoeche on March 2, 1998 to discuss SAM's relationship with Old Sancap. Spinelli described this meeting as positive, indicating that Hoeche "encouraged" him as to the companies' ongoing business relationship. The plaintiff bases its promissory estoppel and implied contract claims on Hoeche's statements during this meeting.

On March 23, 1998, Spinelli's investment group purchased the assets of Old Sancap, forming Plaintiff Sancap. Shortly after purchasing Old Sancap, Spinelli received word from SAM that it planned on establishing its own converting facility in the United States, and would thereafter take over the distribution of the SIA-brand product line.

The parties dispute the motivation underlying SAM's decision to assume distribution of the SIA product line. Sancap contends that SAM's decision was in furtherance of the defendants' conspiracy to eliminate Sancap from the abrasives industry. In response, SAM states that its decision, made before Spinelli's purchase of Old Sancap, stemmed from "concerns over Old Sancap's financial condition, converting quality, sales and failure to timely pay its invoices."

In July 1998, Spinelli summoned the C & S Defendants to a meeting with Spinelli and other Sancap employees. At this meeting, Sancap informed the C & S Defendants that they would have to choose to either remain as sales agents for Sancap or follow the SIA product line. Both chose to follow the SIA product line.

Sancap contends that the C & S Defendants decided to terminate their relationship with Sancap as part of the defendants' antitrust conspiracy. In response, the C & S Defendants state that they simply desired to continue to sell SIA-brand products, which they had successfully sold for many years.

Shortly after leaving Sancap's employ, the C & S Defendants began selling SIA products from another distributor. Sancap alleges that in so doing, the C & S Defendants stole Sancap's secret customer list and tortiously interfered with Sancap's customer relationships.

In October 1998, SAM began its conversion operations, and subsequently took over the distribution of SIA-brand products. Almost one year later, in August 1999, Sancap ceased operations after surrendering its assets to secured creditors.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states the procedure for granting summary judgment:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir. 1987); *SEC v. Blavin,* 760 F.2d 706, 710 (6th Cir.1985). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *See 60 Ivy Street Corp.,* 822 F.2d at 1435.

Factual disputes about matters essential to adjudication preclude the Court from granting summary judgment. *See id.* But not every factual dispute between the parties will prevent summary judgment. Rather, the disputed facts must be material. They must be facts that, under the substantive law governing the issue, might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. *See 60 Ivy Street,* 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street,* 822 F.2d at 1436 (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505). Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505.

The Court now reviews the facts with these standards in mind.

### III. Sherman Act Claims

#### A. Antitrust Conspiracy: Sherman Act § 1

■ Section 1 of the Sherman Act states that "every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign states, is declared to be illegal." 15 U.S.C. § 1. The United States Court of Appeals for the Sixth Circuit has held that a plaintiff must establish five elements to prove a violation of this provision:

(1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within the relevant product and geographical markets; (4) that the objects of the conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

*Int'l Logistics Group v. Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir.1989).

■ To establish the first element of a § 1 violation, a plaintiff may rely on circumstantial, rather than direct, evidence of a combination or conspiracy. However, circumstantial evidence alone cannot establish the existence of a conspiracy if that evidence is equally consistent with independent conduct. *See Re/Max Int'l, Inc.*

*v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir.1999). Rather, a plaintiffs circumstantial evidence "must tend to exclude the possibility of independent conduct in order that an antitrust claim survive summary judgment." *Id.*

■ The Sixth Circuit has set forth factors relevant in determining whether circumstantial evidence tends to exclude independent conduct. Specifically, a court should consider:

(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire.

*Id.*

■ Here, the plaintiff offers only circumstantial evidence to support an alleged antitrust conspiracy among the defendants. The plaintiff contends that this evidence tends to exclude the possibility of independent conduct on the defendants' part.

First, Sancap argues the defendants' actions, unless part of a conspiracy, run counter to their economic self-interest. SIA and SAM's decision to terminate Sancap as a distributor makes little economic sense, Sancap contends, because Sancap distributed 75% of the SIA product line in the United States. According to Sancap, the decision to terminate its distributorship is economically sound only if the defendants entered a conspiracy agreement whereby the C & S Defendants would continue selling SIA-brand products after Sancap's termination. Having secured the future services of the C & S Defendants, who sold 85–90% of Sancap's allotment of SIA-brand products, SIA and SAM could confidently sever relations with Sancap with no economic risk.

Likewise, Sancap states that the C & S Defendants' refusal to accept "substantial and guaranteed compensation" from Sancap runs counter to their economic self-interest, unless they had already made arrangements to continue selling SIA-brand products at a higher rate of compensation.

Second, Sancap claims that the defendants had ample opportunity to exchange information relative to the alleged conspiracy. In particular, Sancap notes that the C & S Defendants "secretly" met with SAM's president during 1997.

Finally, Sancap contends that the defendants had a common motive to conspire. For SAM and SIA, Sancap alleges that the prospect of raising the price of SIA-brand products motivated their participation in the conspiracy. Sancap says that higher commissions motivated the C & S Defendants.

■ In considering the plaintiff's argument, the Court initially notes that the only potential conspiracy alleged by the plaintiff involves SIA and SAM as one conspiratorial party, and the C & S Defendants as a second conspiratorial party. As affiliates, SAM and SIA cannot conspire with each other for purposes of a § 1 claim. *See Directory Sales Management Corp. v. Ohio Bell Telephone Co.*, 833 F.2d 606, 611 (6th Cir.1987). Thus, the Court decides whether the plaintiff's evidence tends to exclude the possibility of independent conduct on the part of these two alleged conspiratorial parties.

The Court finds the plaintiff's evidence insufficient to support a conspiracy for purposes of summary judgment. While the plaintiff's evidence suggests that the defendants may have had an opportunity and a motive to strike an agreement regarding the C & S Defendants' future services, the evidence nevertheless does not tend to exclude the possibility of independent conduct.

Most notably, even absent a conspiracy, the defendants' actions were fully consis-

tent with their economic self-interest. First, SIA and SAM need not have conspired with the C & S Defendants to ensure the continued success of the SIA product line following Sancap's termination. SIA and SAM may have understandably believed SIA customers would remain loyal to the SIA brand rather than particular sales agents. Further, SIA and SAM may have reasonably concluded that the C & S Defendants would wish to continue selling their highest-selling brand rather than remain with Sancap.

Likewise, the C & S Defendants' decision to follow the SIA brand, even when viewed independently, makes economic sense. The C & S Defendants had sold SIA-brand products for a combined 44 years. Approximately 90% of their customers purchased SIA-brand products. In light of their expertise and success with regard to SIA-brand products, the C & S Defendants had good reason to seek an ongoing relationship with SIA and SAM. An inference of conspiracy is not required to accept the C & S Defendants' conduct as economically-sound.

Having failed to offer circumstantial evidence that tends to exclude the possibility of independent conduct, the plaintiff has not made a sufficient showing of a combination or conspiracy. The Court thus grants summary judgment to the defendants on the plaintiff's § 1 claim.

### B. Attempted Monopolization: Sherman Act § 2

■ Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2. To establish an attempted monopolization claim under § 2, a plaintiff must prove (1) a specific intent to monopolize; (2) anticompetitive conduct; and (3) a dangerous probability of success. *See Tarrant Serv. Agency v. American Standard, Inc.,* 12 F.3d 609, 615 (6th Cir.1993).

The Sixth Circuit has explained the importance of market power to the third element of an attempted monopolization claim:

> The third element of attempted monopolization is a dangerous probability of success. The greater a firm's market power the greater the probability of successful monopolization. In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power-the ability to control prices and exclude competition.

*Id.* (quoting *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 826 (6th Cir.1982)).

■ Here, the plaintiff has failed to offer any evidence that would suggest SIA and SAM possess market power even remotely approaching a monopolistic level. Indeed, though market power is often indicated by market share, the plaintiff has not offered any evidence with regard to SIA and SAM's market share in the relevant geographic and product markets.

Having failed to create a triable issue of fact as to the probability of SIA and SAM achieving a monopoly, the plaintiff's § 2 claim cannot withstand the defendants' motion for summary judgment.

### IV. State Law Claims

#### A. Claims Against SIA and SAM

##### 1. Tortious Interference with Business Relationships

The plaintiff alleges that SIA and SAM tortiously interfered with its business relationship with the C & S Defendants. According to the plaintiff, SIA and SAM improperly induced the C & S Defendants to terminate their relationship with the plaintiff.

■ The tort of interference with business relationships generally occurs when a person, without a privilege to do so, induces or otherwise purposely causes

a third person not to enter into or continue a business relationship with another. *See Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235, 238 (1977). To prevail on this claim under Ohio law, a plaintiff must establish each of the following elements:

> (1) a business relationship; (2) the defendant's knowledge thereof; (3) an intentional and improper interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.

*See Chandler & Assoc., Inc. v. America's Healthcare Alliance, Inc.,* 125 Ohio App.3d 572, 583, 709 N.E.2d 190, 197 (1997); *Doyle v. Fairfield Machine Co.,* 120 Ohio App.3d 192, 217, 697 N.E.2d 667, 683 (Ohio Ct.App.1997); *Smith v. Ameriflora 1992, Inc.,* 96 Ohio App.3d 179, 644 N.E.2d 1038 (1994).

▰ In this case, the plaintiff has failed to offer evidence showing that SIA and SAM improperly interfered with its business relationship with the C & S Defendants. Though the plaintiff offers circumstantial evidence suggesting that SAM may have encouraged the C & S Defendants to cease selling products for the plaintiff, the plaintiff has not shown that SAM acted improperly in doing so.

▰ In interpreting Ohio law, the Sixth Circuit has established a balancing test for determining whether a defendant acted improperly in interfering with a plaintiff's business relationship. In making such a determination, a court must balance each of the following factors:

> (1) the nature of the actor's conduct, (2) the actor's motive; (3) the interests of the party with whom the actor interfered, (4) the interests sought to be advanced by the actor, (5) the social interests of protecting the freedom of contracting and the interference with such, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Kand Medical v. Freund Medical Products,* 963 F.2d 125, 128 (6th Cir.1992).

The first, and most important, factor in this test pertains to the general nature of the defendant's conduct. *See id.* (noting that the nature of the defendant's conduct is the "chief factor" in the balancing test). Significant in this regard is whether a defendant engaged in coercive activity. *See id.* at 129. Here, the plaintiff has not offered any evidence suggesting that SAM intimidated or coerced the C & S Defendants into terminating its relationship with the plaintiff.

The second factor set forth by the Sixth Circuit focuses on the defendant's motive. The plaintiff here has not offered any evidence suggesting that SAM intended to injure the plaintiff, rather than simply further its own economic interests.

The third and fourth factors involve the relative interests of the plaintiff and defendant implicated by the interference. In this case, both the plaintiff and SAM had significant interests at stake. The plaintiffs had an interest in maintaining its sales force, while SAM had an interest in securing sales personnel for its SIA-brand products.

The fifth factor relates to the social interests involved in contracting. This factor is of no moment in this case. The C & S Defendants served as independent sales agents, without any contract of employment. If SAM in fact encouraged the C & S Defendants to cease selling products for the plaintiff, SAM only encouraged the C & S Defendants to exercise their legal right to terminate at will their relationship with the plaintiff.

As for the final two factors, the plaintiff fails to offer any evidence or argument as to how the proximity of events or relationship of the parties supports a claim of improper interference against SAM.

The plaintiff has failed to present evidence sufficient to allow a reasonable trier of fact to find any improper interference with the plaintiff's business relationship with the C & S Defendants. The Court,

therefore, grants summary judgment to SIA and SAM on this claim.

### 2. Promissory Estoppel

The plaintiff claims that it detrimentally relied on SAM's alleged promise that the plaintiff would continue to convert and distribute SIA-brand products.

To establish a promissory estoppel claim under Ohio law, a plaintiff must show (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance, and (3) injury resulting from that reliance. *See Cohen & Co. v. Messina,* 24 Ohio App.3d 22, 26, 492 N.E.2d 867, 872 (1985).

The plaintiff has failed to offer any evidence showing that SAM ever made a "clear and unambiguous promise" regarding the parties' future dealings. Indeed, Spinelli acknowledged in his deposition that SAM made no promises regarding a continuing relationship:

> Q. And it is true, is it not, that Mr. Hoeche did not promise or commit that the relationship would continue on March 2, correct?
>
> A. No, not to my recollection.

(Spinelli Dep. at 769–770.) Spinelli indicated only that the overall tone of his meeting with Hoeche was positive. However, Spinelli's subjective impression of the meeting's tone does not establish a "clear and unambiguous promise" for purposes of a promissory estoppel claim.

Lacking evidence of any promise on the part of SAM, the plaintiff's promissory estoppel claim cannot withstand the defendant's motion for summary judgment.

### 3. Implied Contract

The plaintiff argues that the "same grounds" supporting its promissory estoppel claim support its claim under a theory of implied contract.

To establish an implied contract under Ohio law, a plaintiff must prove each of the elements of a contract, *i.e.* an agreement, based on a meeting of the parties' minds and mutual asset, to which the parties intended to be bound. *See Penwell v. Amherst Hosp.,* 84 Ohio App.3d 16, 21, 616 N.E.2d 254, 258 (1992).

However, a plaintiff need not show that the parties formally exchanged promises. Instead, a "contract implied in fact may be proved by showing that the circumstances surrounding the parties' transactions make it reasonably certain that an agreement was intended." *Lucas v. Costantini,* 13 Ohio App.3d 367, 369, 469 N.E.2d 927, 929 (1983).

Just as the plaintiff failed to support its promissory estoppel claim, the plaintiff likewise offers no evidence suggesting that an implied contract existed between SAM and the plaintiff. Further, Spinelli's admission that SAM made no representations regarding the future of the parties' relationship belies any claim that the "circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended."

The plaintiff has failed to show that a genuine factual dispute exists with respect to its implied contract claim. The Court thus grants summary judgment to SIA and SAM on this claim.

### B. Claims Against the C & S Defendants

The plaintiff asserts claims for both theft of trade secrets and tortious interference with business relationships against the C & S Defendants. Essentially, the plaintiff claims that the C & S Defendants stole the plaintiff's "secret" customer list, and subsequently interfered with the plaintiff's customer relationships.

The plaintiff has offered no evidence to support either claim. Indeed, the plaintiff failed to even address these claims in its memorandum opposing the C & S Defendants' motion for summary judgment. Consequently, finding that the plaintiff has abandoned these claims, the Court grants summary judgment to the C & S Defendants.

IT IS SO ORDERED.